OF THE

## STATE OF IOWA

AT

## DES MOINES, MAY TERM, A. D. 1905.

AND IN THE FIFTY-NINTH YEAR OF THE STATE.

---

STATE OF IOWA v. AUGUST LEUTH, Appellant.

128 189
140 669

**Kidnapping Defined:** CORPUS DELICTI. Actual detention of a person
1 though for a short time, with the purpose and intent of extort-
ing money as the price of liberation, is a violation of the statute
against kidnapping, regardless of how such person came to be
in the place where detained.

**Identity of Defendant:** EVIDENCE. On a prosecution for kidnap-
2 ping for a ransom, the evidence is reviewed and held sufficient
to identify the defendant as the perpetrator of the crime.

**New trial:** NEWLY DISCOVERED EVIDENCE. Newly discovered evidence
3 of an impeaching character and on a collateral issue is not
ground for a new trial.

*Appeal from Cedar District Court.*— HON. B. H. MILLER, Judge.

TUESDAY, MAY 2, 1905.

THE defendant was convicted for the crime of kidnapping for ransom, and appeals.— *Affirmed.*

*Sam. S. Wright* and *Wright, Leech & Wright,* for appellant.

*C. W. Mullan,* Attorney General, *C. J. Lynch,* and *W. N. Treichler,* for the State.

LADD, J.— Mary Telsrow was 60 years of age, and lived with her husband two and three-quarter miles south and one-half mile west of Bennett. Two of their sons, Gustav and Louie, were at home; the one 23, and the other 30, years of age. The family retired at 10 o'clock in the evening of August 16, 1903. Between 11 and 12 o'clock Telsrow was awakened by the calls of some one in the yard, who knocked on his window and with an oath asked why he did not come out. Upon raising the window he was informed by the stranger that another son was sick at Walcott, and that he was an employé of a neighbor and had been sent after them. Telsrow then awakened his wife and boys, and all dressed. As their team was in the pasture, the stranger offered to take the father and mother to Walcott and promised to bring them back. They were taken into the buggy, and, after driving about one and a half miles east, one mile south, and again one-half mile east, the stranger tied the team to a fence and sat down on the grass a short distance away for a few minutes, and then returned with his revolver pointed toward them and demanded money. Telsrow answered that he had none. The stranger then told him he must bring $50,000 to Paul Weiss' corner the following night, and threatened that, unless this was done, he would kill his wife. He then or-

dered the husband from the buggy and directed him to go home, saying that, though some one was watching the road, he would not be harmed, and not to mention the matter, else he and the boys would be killed and their property burned. Telsrow returned home, and the stranger immediately drove away with his wife. She reached the home of Arthur Agnew, three miles east of Bennett, at about 8:30 o'clock the next morning, afoot and alone, with clothes wet, dusty, and torn. Later in the day her wraps were found in the cellar of a vacant house of one Ruser, eighty rods distant, and her hat in the orchard near by.

I. Appellant first contends that the *corpus delicti* was not proven, in that the intent in taking was to rob, and not to kidnap. But the crime denounced by the statute may be committed in either of two ways: (1) By taking or enticing a person from any place, or (2) by imprisoning, detaining, or holding a person at any place, regardless of how he came to be there. This is apparent from the language of the law:

1. KIDNAPPING: corpus delicti.

> That whoever kidnaps, takes or carries away any person, or decoys or entices such person away, from any place in this State, for the purpose of or with the intention of receiving or securing from any one any money, property or thing of value, as a ransom, reward or price for the return of the person so kidnapped, taken, carried, decoyed or enticed away, as aforesaid, or whoever shall imprison, detain or hold any person at any place in this State for the purpose or with the intent of receiving or securing from any one money, property or thing of value as a ransom, reward or price for the return, liberation or surrender of the person so imprisoned, detained or held, shall be deemed to be guilty of the crime of kidnapping for the purpose of ransom, and upon conviction thereof shall be imprisoned in the penitentiary during life, or for any fixed term of years not less than ten years.— Chapter 142, page 105, Acts 29th General Assembly.

It may well be doubted whether, in procuring Telsrow

and his wife to go with him, the stranger entertained any purpose other than that of robbery, and therefore the taking or enticing by means of the false report of a son's sickness was not with the unlawful purpose denounced by the statute. But the fair inference from what was then said and done is that, upon discovering that they had no money, he immediately conceived the design of detaining her in order to extort money from him as the price of her subsequent return, surrender, or liberation; and if he so did, and actually detained her for any length of time with that intent, he was guilty of the offense charged. The evidence warranted this conclusion. Certainly Mrs. Telsrow did not continue with this stranger voluntarily. The order given her husband to get out of the buggy was inferentially a direction for her to remain in, and when this was complied with, with the threat that, unless the money was forthcoming she would be killed, the only reasonable deduction was that the wife would be detained, to be returned upon the delivery of the money or killed upon his failure to bring it. That both so understood conclusively appears from what followed. Telsrow went home and the stranger drove away with his wife. This was such a detention as contemplated, and if but a short time and in the buggy it was at a place and long enough to satisfy the terms of the statute. That she was subsequently released or escaped can make no difference. The consummation of the scheme was not essential to establish guilt. The demand may have been excessive; but, if made, this was material only as bearing upon the stranger's intent. The absence of details as to time and the like for delivering the money may have been owing to the suddenness with which the plan was formed, or to the inexperience or lack of foresight in the perpetrator, but in any event, was for the consideration of the jury in determining his purpose. The finding of the jury that the crime charged was committed by some one has support in the evidence.

II. The defendant denied all knowledge of the transac-

tion, and stoutly insists that the evidence does not identify him as the culprit.    At that time he was little over. 18 years of age and had been in this country less than two years.    He was shown to have been industrious, but had been out of work for two weeks previous, during which he had been seen occasionally near the vacant house in the cellar of which Mrs. Telsrow's wraps were found; and two witnesses testified that they saw him walking rapidly away from that house at about the time she reached Agnew's.    A satchel, containing clothing and a box of cartridges, belonging to him, was found in the attic.    At 11 o'clock of that evening he was arrested while asleep in a barn owned by Telsrow, one-half mile west of his house, and had in his pocket a loaded revolver and a knife.    Mrs. Telsrow was unable to attend the trial as a witness, but her husband and two sons were positive in their identification of defendant as the person who took her away.    True, Telsrow, on cross-examination, after explaining that he was so that he could not say anything on the night the accused was arrested and brought to his house, admitted he did not then know whether "it was him or not."    He had not then so stated, and this concession, though tending to discredit his identification, denoted candor; and, as he testified that, though scared, he had looked into the face of his assailant when the revolver was pointed at him, and noticed him particularly in the moonlight, his positive identification of defendant, corroborated as it was by his sons, and the evidence of defendant's presence at the vacant house, might well have been accepted by the jury as sufficient.    All agreed that the stranger spoke in the German language, and defendant could speak in no other.    An attempt was made to impeach Gustav by showing that he had said, on the following day, that the stranger spoke partly in English, and Louie by proving that he had stated that he looked up, so that his face could not be seen. These matters went to their credibility only, which was solely for the determination of the jury.    The identification of de-

2. IDENTITY OF DEFENDANT: evidence.

fendant as the perpetrator of the crime was such as to preclude interference with the verdict by this court.

The evidence of Dr. Chapman could have worked no prejudice, and the newly discovered evidence was impeaching in character and on a collateral matter. It was not such as to indicate a different result might have been anticipated on another trial. See *State v. Hasty,* 121 Iowa, 507.

3. NEW TRIAL: newly discovered evidence.

The record is without prejudicial error, and the judgment is *affirmed.*