(123 So. 250)

### CLAYTON v. STATE. (6 Div. 303.)

Court of Appeals of Alabama. April 16, 1929.

Rehearing Denied May 7, 1929.

Horace C. Wilkinson, of Birmingham, for appellant.

Charlie C. McCall, Atty. Gen., and Thomas E. Knight, Jr., Asst. Atty. Gen., for the State.

SAMFORD, J. This case is in effect a companion case to Doss v. State, 123 So. 237,[1] pending in this court, in which case is discussed the organization of the grand jury and the rulings on demurrer. On these two questions the rulings of this court are the same in both cases. It therefore becomes unnecessary to repeat them here.

At the beginning of the trial the defendant moved the court for a continuance for and on account of public excitement and prejudice engendered against him by reason of publications appearing in three daily papers relative to the trial in the Doss Case and the rulings of the court and incidents occurring in the trial of Doss and incidental to the preliminaries in the trial of this case, all of which were in the presence and hearing of the jurors who were to try and determine the issues in defendant's case. It was contended that by and through all these influences the minds of the jurors had become so filled with the "atmosphere" of the trial adverse to defendant as to render a fair trial at that time unlikely. Every lawyer of any considerable experience will know and understand what is meant by the term "atmosphere of the trial," and will appreciate the difficulty

[1] Post, p. 168.

of a trite description of such a condition. Such condition can only be produced by facts, incidents, happenings, and subtle influences concurrent with and connected with the trial of a case in court and on trial. Incidents which of themselves are innocent enough and ordinarily would mean nothing under some circumstances may aid in feeding an excitement of the mass mind to such an extent as to make the act one to be considered seriously in determining the question of a prevailing prejudice. As in this case the defendant and Eugene Doss and others were indicted by the grand jury of Blount county on a charge of kidnapping one Calloway and giving him a flogging. This indictment followed the call of the grand jury and was set for trial, at a special call of the circuit court of Blount county called for the purpose of trying the cases of this defendant and others indicted by the grand jury for the kidnapping of Jeff Calloway. The indictments were returned into court on July 19, 1927, and on August 1, 1927, the trial of Doss was entered into and continued to and into the beginning of the trial of this case on August 4, 1927. The trial was conducted by the Attorney General of the state, assisted by two of his Assistant Attorneys General and the circuit solicitor, while the defendant and Doss were represented by eminent lawyers from Birmingham and Oneonta. There were also present at the Doss trial and at this trial reporters for the associated press and three leading daily newspapers of general circulation both in Oneonta, the place of trial, and throughout the state. It was charged generally in the town and county and in the press that Doss and this defendant were members of a secret order called the "Knights of the Ku Klux Klan," and that the kidnapping and whipping of Calloway was the result of an order of this secret organization who paraded in robes and hoods and were attempting behind their hoods to set up an "invisible government" to correct the morals of certain communities. So far as the veniremen and the crowds attendant upon the court were concerned, the trials of Doss and this defendant were one and the same and merged naturally into one another, and the incidents occurring during the Doss trial and in the presence of the entire venire must of necessity have affected the trial of this defendant. At the beginning of the trial in the Doss Case and in the presence of the entire venire one James Esdale, who was called "Grand Dragon" of the Knights of the Ku Klux Klan, was called and examined, and on the pretext that he was being examined touching a subpoena duces tecum, in which the records of the K. K. K. lodge at Tarrant City were called for, the state entered into an inquiry of the management and control of the K. K. K. in the state and as to its activities in defending the pending cases, and the employment of counsel. The extent of this examination covered a wide range and extended over 14 pages of the transcript. Immediately following this examination the tendency of which was to draw the K. K. K. into the trial, the prosecution of this defendant proceeded. The proceedings of the Doss trial were published at length in the three daily newspapers above referred to and circulated freely in Oneonta and among the veniremen, most of whom answered in court that they had either read the reports, heard them read, or heard them discussed. These newspaper reports carried a group picture of the six men indicted for kidnapping Calloway, and were interspersed with head lines suggesting the highest points in the testimony such as:

"Calloway case given to jury, submitted without argument. Report to court ordered for 8:30 o'clock Thursday morning. Dramatic moves mark last day. Wilkinson fails in strenuous effort to discredit witness."

These reports also contained comments on the trial, such as:

"Oneonta Interested.

"Oneonta is still intensely interested in the trial and the crowds in the courtroom still filled the room to capacity. It is believed that the state will close its case late this afternoon and that the defense will require at least two days to present its evidence. James Esdale, Grand Dragon of the Ku Klux Klan in Alabama, for whom an instanter subpoena was issued yesterday on order of Judge O. A. Steele, was served with the attachment late yesterday in Birmingham. Esdale, wanted by the state as a witness, took his place in the witness room with other witnesses. Judge Steele did not indicate whether or not he would take any steps against Esdale for the latter's failure to answer a summons as a witness."

"High points of the testimony came when Wilkinson made Tom Hughes, one of the Tarrant City Klansmen who gave valuable information to officers during the investigation, admit that he had been constantly under guard of the state law enforcement officers, and McCall developed that Hughes had been threatened by nearly 50 people since the day he told McCall the details of the flogging on June 26th.

"Two Words Play Part.

"The dramatic moment of the afternoon was furnished in the cross-examination of Tidwell, when Wilkinson nearly discredited the witness and his testimony. The incident revolved about the use of one of two words, 'Could' or 'Would.' Tidwell on direct examination had told the jury that he had told McCall on July 15th the complete details of the Calloway flogging, only after McCall had

made the statement that he, Tidwell, could be put in jail if he did not tell the truth. On cross-examination, Wilkinson led to the same statement and then placed Tidwell in a quandary, because he could not remember whether he had said 'Could' or 'Would,' on direct examination.

### "Tells of 'Coming Clean.'

"Had Wilkinson succeeded in getting Tidwell to say that he had originally used 'Would' on direct examination, it would have meant that his statement to McCall had been obtained by threats, and such statement is not legal. In explaining how he happened to 'Come clean' with McCall, he said that he finally told the story after McCall had drilled him for more than an hour, during which time McCall had told him nearly as much about the flogging as he already knew. He even told me what side of the automobile I was riding on on the trip from Antioch Church to where the flogging occurred. Tidwell said that up to that time he had told McCall nothing more than that he had gone to Antioch Church that night."

### "The Heart of the Issue.

"Counsel for the defense asked the witness if Calloway was drinking, but the state's objection was sustained by the court. To still another question whether Calloway took a drink or had liquor in his possession, the court would not permit an answer. Counsel for the defense asked several questions in rapid fire along this line, whereupon Judge Steele asked him if he meant that if Calloway was drinking or had liquor in his possession, it was an excuse for the infliction of the punishment given Calloway. Counsel responded promptly, 'No, not at all.' Several other queries regarding drinking brought a reprimand from the court.—From a news account of the Doss flogging trial.

"The state of Alabama has a reason to congratulate itself that a man of Judge Steele's caliber is presiding at Oneonta. His courage and acumen are revealed in the foregoing passage. He is a Judge who hews to the line, letting the chips fall where they may. Here, furthermore, is a judge who sees with the utmost clarity the heart of the issue involved in the substitution of private vengeance for the processes of the law. Counsel for the defense may, with the utmost clarity, deny that he wishes to present young Calloway's drinking as an excuse for his flogging, but why did he make the inquiry if such was not his purpose, and why did he continue the self-same questioning in the teeth of Judge Steele's ruling, unless he was anxious to drive home to the jury a connection between Calloway's alleged tippling and the outraged sensibilities of the hooded mob? It is a common practice for lawyers to try to squeeze in improper testimony through the devices of the pettifogger, and it is the too common practice of judges, when counsel is formidable or when political consequences may seem to be involved, to overlook these tricks of the courtroom. But Judge Steele evidently will not be browbeaten. He has risen magnificently to the height of his obligation. He has resolved to be just and fear not.

"The quoted passage is significant for another reason. When newspapers have spoken out against the deep damnation of masked violence, apologists of the hateful system have sought to justify the spirit, if not the facts, of hooded terrorism, by pointing out the moral defects of victims of the mob. Even Ministers of the Gospel have been known in one breath to pay lip-service to legal procedure and in the next to dwell upon the sins and lapses of the individuals upon whom masked brutes have wreaked their wrath.

"Was Calloway's conduct, whatever depths it may have plumbed, any justification for his flogging? No, a thousand times no. It was the law, and the law alone, which should have dealt with him, and when by indirection or otherwise, the defense seeks to impress upon the jury Calloway's liquor habits, it is trying to play upon possible prejudices, in order that the processes of justice may be polluted, as decency and right were polluted when a brutal gang executed its murderous will upon the helpless body of Jeff Calloway."

And many other such articles as are above quoted were published and circulated for several days immediately before the trial in this case and were read and discussed by the veniremen.

While the jury to try this defendant was in process of selection, the trial judge of its own motion cited Dr. Finnell for contempt of court, in that he made a speech on the streets of Oneonta at the noon recess of the court, regarding the Doss Case, then being tried, and had given an interview to the press regarding certain matters involved in the Doss trial in which he had severely criticized the newspapers for publication they had made regarding the Calloway whipping. After an extended examination in open court and in the presence of 37 of the venire, the court assessed a fine against Dr. Finnell and ordered him into the custody of the sheriff. At this juncture the jury in the Doss Case returned a verdict of guilt in response to the affirmative charge for the state, and the court at once proceeded to judgment and sentence of Doss in the presence and hearing of the entire venire as follows:

"The Court: It is the sentence of the law and the judgment of this court that for the offense of which a jury has convicted you

that you be confined in the state penitentiary of this state for a period of not less than eight years and not more than ten years. This offense for which you have been convicted strikes at the very liberties of the citizenship of this country. When a man undertakes to take the law into their own hands, prescribe rules for human conduct, and inflict punishment for a violation of those man made rules without authority of law, it is in defiance of all the institutions of this country; it is in the face of the declared purpose of the Declaration of Independence. It is declared by our forefathers that all men were born free and equal, entitled to certain inalienable rights, among which was life and liberty and the pursuit of happiness, and into the Constitution of every State of this Union, and into the Constitution of the Union itself has been written this declaration. Courts of Justice have been erected under that Constitution by every State in this Union for the enforcement of that Constitution and the Statutes of these States and of our country, and for the orderly conduct of men and for the punishment of disorder. When a man, or a set of men undertake to inflict punishment for a violation of those rules, it is done in defiance of all law and all order. I don't think you are entirely to blame about this thing. What I mean to say is, that the entire blame is not on you, and not on your neighbors in Tarrant City either. The men who invited you there, and at whose instance you went, while they may not be legally responsible for it, yet but for the invitation you had from the other folks you would not have been there. You don't look like a bad man to me. You have got a good face. I have thought throughout this trial every time I looked at you, 'That man has not got a bad countenance.' I don't believe you are bad. I think you have some bad ideas. Every lick that you struck Jeff Calloway was a lick at the liberties of the citizenship of this country. That is a thing that cannot be tolerated. You and I must live in this country, and be peaceful, and conform ourselves to the law. If you wanted to punish Jeff Calloway, it didn't make any difference how Jeff Calloway had acted and I dare say that from what testimony I have heard he had acted pretty bad, but if you really wanted to punish him you could have turned him over to the proper and duly constituted officers. Under this evidence you were within 50 yards of the county jail, and within 50 yards of the county court house where they have a sheriff and a county judge close by with authority to inflict punishment on Jeff Calloway for his offense. But instead of doing that, you and those associated with you took this man into another county, in the dark hours of the night, and inflicted the punishment upon him. There is no mitiga-

tion for this offense and no justification for it. The court could have given you two years, but that is the minimum number of years put in the statute and is to enable the courts to use in cases where there is some mitigation, and there being no mitigation and no justification in this case, the sentence is not less than eight years and not more than ten years.''

The colloquies between the court and attorneys, between attorneys and attorneys, the examination of witnesses, the crowds attendant upon the trial, the discussion of the cases on the streets, the rumors and charges of threats against witnesses and parties, and many incidents appearing in the record, all tend to show a condition of intense interest and excitement and an inflamed condition of the public mind surrounding the court during the entire term of the court, which must have had its psycological effect upon jurors and apparently upon the court itself.

The question is, Should this defendant have been tried under these conditions, and, being so tried, could he receive at the hands of court and jury that fair and impartial trial contemplated by section 7 of the Constitution of this state? The crime charged in this indictment is of the gravest nature and is an assault upon the citadel of our institutions. Such crime is to be condemned by all good men who love liberty and order. For a mob to take a citizen and unlawfully to assault and beat him or to take his life or deprive him of his liberty is an attack upon the law from without and measures strength with the law and organized government. But such an act is not to be compared with a proceeding conducted under the name of law, and in one of our temples of justice, where the public mind has been whipped into flame and where passion, prejudice, excitement, outside influence, or political expediency is allowed to dominate a trial of a citizen charged with crime and who is presumed to be innocent until his guilt is established beyond a reasonable doubt. This would be an assault from within and would tend to create a distrust of law and a destruction of the safeguards of our freedom. An inflamed public mind is unreasonable and unreasoning and is a dangerous thing to deal with. Under such a condition, if justice is meted out, it is an accident, rather than the result of calm deliberate consideration of the law and the facts. Such a condition lends ready aid to injustice and opens the way for prejudice, corruption, false swearing, persecution and lawlessness of all kinds.

It may be that this defendant is guilty of the offense with which he is charged, and that, conscious of such guilt, he stood mute upon his trial, declining to go upon the stand

to testify, as was stated by the trial judge in his somewhat lengthy and fervid lecture to the defendant at the time of sentence when the defendant stood mute and helpless before him. As to this we do not know and do not express an opinion. Or, it may be that feeling the uselessness of testifying, under the circumstances of his trial, he elected to take his chances on the record as it had been made with a faith in a system of laws which gave him a right of review. Of this we do not know and express no opinion. But of this much we are convinced beyond a peradventure, the public mind at the trial was so inflamed and excited, and this was at least in a measure participated in by the veniremen drawn to try this case, that any verdict rendered in the trial rests under the imputation of being obtained without that consideration to which the defendant was entitled under the Constitution of his state. This being so, the court should have granted the defendant's motion for a continuance.

We are familiar with the well-known rule which gives to the trial judge the widest discretion in passing upon motions for continuance, but as we view it this is an extreme case calling for the exercise of the power of this court to the end that constitutional guarantees will be maintained. Seay v. State, 207 Ala. 453, 93 So. 403; Collum v. State, 21 Ala. App. 220, 107 So. 35; Com. v. Dunham et al., Thacker, Crim. Cases, 516; State v. Manns, 48 W. Va. 480, 37 S. E. 613; Com. v. Fletcher, 208 Pa. 137, 57 A. 346; State v. Rarabacher, 19 Iowa, 154; State v. Painter et al., 40 Iowa, 298; Gladden v. State, 12 Fla. 562; Whitley v. State, 38 Ga. 50.

The evidence in this case tends to prove: That there was a religious meeting being held at Antioch Church in Blount county and about ten miles from Oneonta. That to this meeting members of the Ku Klux Klan were invited and attended in considerable numbers, though the meeting was open and the congregation was not confined to members of the Klan. The members of the Klan who attended were in full regalia, including white robes and hoods. That at this meeting speeches were made setting forth the intention of the Klan to break up bootlegging and other immoral practices. That during the progress of the meeting Jeff Calloway appeared on the church grounds. That he was in possession of a bottle of whisky partly consumed. That he was under the influence of whisky. That his behavior was such as to disturb the meeting, and that about the close of the meeting six of the robed and hooded figures forcibly took Jeff Calloway, put him in an automobile, carried him through Oneonta and on towards Birmingham and into Jefferson county, took him out of the car in the woods, took him a short distance from the road and car, forced him to put his arms around a sapling, and whipped him severely with switches, released him and told him to run, which he did. In developing this evidence there were a large number of objections and exceptions, probably 100 or more. To pass upon each of these exceptions would extend this opinion to unreasonable length, and so we deal with the questions presented, as far as possible, by laying down general rules for the guidance of the court on another trial.

It was relevant and proper to describe the church and its surroundings, including the road from the church, through Oneonta to the place where the whipping took place. This territory constituted the locus in quo, a description of which is always relevant.

It was relevant and proper to prove the character of the meeting being held in Antioch Church at the time Jeff Calloway came there. The statutes of this state recognize the rights of the people to meet peaceably for religious worship, instructions, or for social enjoyment, and under sections 3881, 3882, of the Code of 1923, such meetings are given the express protection of the law. If it was error to admit evidence tending to prove that the members of Tarrant City Lodge K. K. K. had received a special invitation to attend the meeting, such error was not injurious to this defendant, but rather tended to the advantage of the defendant's cause.

Everything said and done by the defendants or their associates, after the arrival of Jeff Calloway on the grounds, which tended to connect this defendant with the crime charged, and everything said and done by Jeff Calloway on the church grounds tending to show a breach of the peace, or a disturbance of the meeting in the church, or anything said and done by Calloway which would tend to induce the alleged attack upon him or his being legally taken into custody or placed under arrest, was a part of the res gestæ and as such was admissible. In excluding this evidence and in sustaining objections to questions seeking to prove the misconduct of Jeff Calloway at the church the court committed error prejudicial to this defendant.

Under the evidence in this case the res gestæ includes everything said and done by any of the parties present and relating to the crime charged, from the time Jeff Calloway arrived on the church grounds until he had been released by the parties after the whipping in Jefferson county, the transaction having been continuous. Lancaster v. State, 21 Ala. App. 140, 106 So. 609.

One Jackson was examined by the state. On cross-examination he was asked "if he knew his own general reputation in the community in which he lived," and "if he knew his general reputation in the community in which he lived for truth and veracity."

These questions were objected to by the state; objections were sustained and exceptions reserved. The witness was competent to testify to any fact within his knowledge. The question called for relevant testimony, and these rulings were error. State Realty Co. v. Ligon, 218 Ala. 541, 119 So. 672.

The next question is a construction of section 3189 of the Code of 1923 called the "Kidnapping Statute." Many rulings of the trial court are based upon the construction which it placed upon this statute, and without pointing out each ruling they are all treated and considered in the general statement of the law which follows. This statute reads: "Any person who forcibly or unlawfully confines, inveigles, or entices away another, with the intent to cause him to be secretly confined, or imprisoned against his will, or to be sent out of the state against his will, must, on conviction, be imprisoned in the penitentiary for not less than two nor more than ten years."

While there are other statutes which might have been applicable to the facts in this case and might have been included in the indictment—notably sections 4938, 3300, 3299, or 3303—the state elected to plant its prosecution on the section above quoted.

The part of the statute with which we are concerned would read: "Any person who forcibly or unlawfully confines * * * another, with the intent to cause him to be *secretly* [italics ours] confined, or imprisoned against his will," etc., is guilty of kidnapping. It will be readily understood that not every forcible confinement or imprisonment is a violation of the kidnapping statute. Every confinement in jail or the penitentiary is a forcible confinement. And it is not every secret confinement which is a violation of law. It *is* an essential element of the offense that the taking or detention of the person shall be without lawful authority. 35 Corpus Juris, 903 (4). There are statutes of other states providing that the taking must be with the intent to hold for service, robbery, or extortion and the like, while our statute is limited to confinement or imprisonment against his will or to be sent out of the state against his will. So that, to constitute a crime under this statute, in this state, the act must be unlawful and with the intent to secretly confine or imprison (i. e., conceal) against his will or to be sent out of the state against his will. This is emphasized by the succeeding section 3190 of the Code, which provides for additional intents and different punishments. That being the case, the taking of Calloway in this case must be for one of the purposes enumerated in the statute. What the parties did to the person seized after the confinement is, however, evidence of the original intent and also is relevant in aggravation or extenuation of the punishment. The foregoing is sustained by the text in 35 Corpus Juris, 904 (5), and supported by authorities cited in note 46; see, also, People v. Fisher, 30 Cal. App. 135, 157 P. 7.

The intent with which the act was done is a necessary element of the offense and must be shown to be the intent described in the statute. 1 Whar. Crim. Law, pp. 994-996. The court charged the jury and by its several rulings on the question held that this intent ex necessitate occurred at the church where seizure took place, but we hold that the intent may have been formed at any time before Calloway was released. The original seizure may have been lawful; i. e., Calloway may have been engaged in the commission of a misdemeanor at the time of his seizure, and the parties who seized him might have acted in good faith in making an arrest under section 3263 of the Code of 1923, yet, if the intent was changed from a lawful purpose to a criminal intent after the parties left the church, whatever crime was committed had its inception at that time. But the res gestæ of this transaction covers the period between the time Calloway came to the church and when he was released, and everything said and done by any of the parties, including Calloway, which related to the crime or tended to justify the defendant was relevant. This included the drinking of intoxicating liquors by Calloway and acts tending to prove public drunkenness. People v. Harrison, 261 Ill. 517, 104 N. E. 259.

Do the facts here tend to show an intent to secretly confine or imprison Calloway against his will within the meaning of this statute? Every unwarranted holding of a person against his will is in a sense an imprisonment, and every kidnapping carries with it and as a part thereof a confinement or imprisonment, but where it is clear from the evidence that the purpose of the parties is to inflict a beating, however wrongful and revolting, can it be said that the confinement incident thereto is a secret confinement within the meaning of the kidnapping statute? It is perfectly clear that by this statute the Legislature did not intend to constitute a simple false imprisonment a felony. When the unlawful imprisonment is a felony it must be coupled with some other act raising it to an aggravated species, and a secret confinement does that thing. In this case there can be no doubt of the confinement or imprisonment and a question for the jury as to whether such confinement was intended to be secret. The first definition of "secret" given by Webster's Dictionary is: "Hidden; concealed; not revealed; private; as secret plans; secret vow." Did the defendant and his associates intend whatever they ultimately did to Calloway should be done in secret—hidden? They were robed and masked, with their own identity covered and concealed;

they took Calloway from a public gathering, confined him in an automobile, and took him away along a public road at 10 o'clock at night; they continued this course until they were far separated from anybody except such as were clothed as were they; they stopped at a lonely spot on the road in the woods, took Calloway out of the automobile, carried him away from the road and deeper into the woods, and caused him to put his arms around a hickory tree, where they proceeded to flog him. After this Calloway was set at liberty in the woods at night and allowed to run. This surely would warrant a jury in finding that the imprisonment of Calloway was intended to be secret and that it was of an aggravating species far and away from a technical restraint which the courts hold to be false imprisonment. The trial court so held and this ruling is approved. The length of time of the imprisonment is of no moment. When the act is done the offense is complete and the release does not right the wrong. State v. Leuth, 128 Iowa, 189, 103 N. W. 345. Nor could the fact of the whipping divest the acts of its secretiveness, but was a fact to be looked to in aggravation of the offense. We have read the case of People v. Camp, 139 N. Y. 87, 34 N. E. 755, from the New York Court of Appeals, but the facts in that case differ very materially from the facts here. There a man seized his daughter and removed his daughter, in broad day light, over public highways, in the presence and view of many people. He took her to a public asylum where there were public officials in charge, numerous physicians and other people. The man was not masked and made no secret of his purpose to confine his daughter in the asylum. The appellant has furnished us with no authority where the facts similar to those in the case at bar were held not to constitute a secret confinement. The confinement was from the time of the seizure to the time of release; time of forming the intent, whether formed before, at the time of seizure, or afterwards, is not material; if it was formed at any time during the progress of the imprisonment and in Blount county the crime was complete, and this was a question for the determination of the jury under the facts.

Upon the question of where, if at all, the intent to unlawfully and secretly confine Calloway was formed, it was relevant for the defendant to prove that at the time he was seized at the church Calloway was disturbing religious worship; that he was publicly drunk and evidencing a drunken condition by and in the way described in the statute; that he was in the possession of whisky and was using abusive language in the presence of females. If, acting in good faith under section 3267 of the Code of 1923, the parties arrested Calloway for a crime then being committed in their presence, the intent to secretly confine, if formed, must have been formed at a later time and place. The defendant may in all good faith have arrested Calloway, started with him to jail, and other causes may have changed the purpose, which change was not participated in by this defendant.

The demurrer to the defendant's plea in abatement on the ground that the grand jury returning the indictment was not organized as provided by law is discussed and decided in Doss v. State, post, p. 168, 123 So. 237. The same ruling applies here.

After a careful reading of this record, in which there appears some statements of the trial judge marked by impatience, we are not convinced that he evidenced such bias and prejudice as to warrant us in holding that he committed error in refusing to grant defendant's motion that he recuse himself. Ex parte Von L. Thompson et al., ante, p. 46, 121 So. 429.

Tom Hughes was one of the principal witnesses for the state. It was insisted by the defense that this witness was an accomplice in whatever crime was committed. He had testified to a state of facts from which the conclusion might be drawn that he was an innocent bystander. Upon cross-examination he was asked the following questions, which were objected to by the state, objections were sustained, and exceptions reserved, to wit:

"Q. During the course of your investigation by the Attorney General in Birmingham, did you go to Dr. Hutto there at the drug store and ask him to make a bond for you?"

"Q. Did you ask him to make a bond for you, or if he would make a bond for you in connection with the Calloway whipping?"

"Q. I will ask you if when you made that request Dr. Hutto asked you why you needed bond?"

"Q. I will ask you if in response to that question you stated to Dr. Hutto at that time and place that the Attorney General had you under a hot fire, and it looked like you were going to need a bond in connection with the Calloway whipping?"

"Q. I will ask you if at that time and place you asked Dr. Hutto: When a fellow points you out, what can you do about it?"

"Q. And if in response to that question Dr. Hutto said: What do you mean by 'What can you do about it'?"

"Q. And then in response to that you said: 'I have got to unload on somebody'?"

"Q. Or if you said to Dr. Hutto: 'I am going to unload on somebody'?"

This was error on the part of the court. (1) If the witness was an accomplice, no conviction could be had upon his uncorroborated

testimony. (2) The inquiry was relevant as tending to impeach his testimony. On cross-examination full latitude should be allowed to test the testimony of the witness, as to motive, interest, bias, etc. And while there is a limit, courts should recognize the importance of cross-examination in exposing fabrications. McAdams v. State, 21 Ala. App. 193, 106 So. 622; Winston v. Cox, 38 Ala. 274; Amos v. State, 96 Ala. 120, 11 So. 424.

The objection to the question propounded to state's witness Tidwell on cross-examination, "Q. Have you been promised that you wouldn't be indicted, or has it been intimated to you that you wouldn't be indicted?" was properly sustained. The question should have been limited to some one having apparent authority to make such a promise. The questions propounded to the witness Calloway of a similar tenor were objectionable for the same reason as above.

The court committed error in refusing to permit the defendant on cross-examination of Calloway to inquire as to his conduct and condition as to sobriety there on the church grounds at the time and immediately before he was taken in custody. If for no other reason this had a bearing on the mental condition of Calloway, which may have affected his testimony. Garner v. State, 4 Ala. App. 155, 58 So. 123.

It was shown by the evidence that Calloway went to Antioch Church in a car with W. B. Jackson. Jackson testified as a witness for the state. It was error for the court to refuse to permit defendant to inquire of this witness as to how much liquor he and Calloway drank while on the way to the church—this for the purpose of testing the accuracy, reliability and the capacity of the witness to observe and recollect. Hannah v. State, 19 Ala. App. 574, 99 So. 60.

The state introduced as a witness one John Wade, who testified that he was, prior to June 26th, Exalted Cyclops of the K. K. K. at Oneonta, and prior to that date and in his official capacity he had extended an invitation to the Tarrant City Klavern to be present at a church meeting in Blount county; that the invitation was in writing; that he received no reply to the invitation; that he with other members of the Oneonta Klavern, went to Antioch Church on the night of June 26th and that there were other Klansmen there not members of the Oneonta Klavern. All of the above was over the objections and exceptions of the defendant seasonably made. There is not a scintilla of evidence in this record tending to prove a preconcerted agreement between the members of the Tarrant City Klan to whip or to molest Calloway. In the absence of some such evidence all of this evidence was irrelevant. Having

been admitted, the witness was subject to legitimate cross-examination.

Over objections and exceptions of defendant seasonably made, the state was permitted to examine the witness Tidwell in minutest detail as to organization, officers, and as to what took place in the Tarrant City Klavern prior to June 26th. Such questions as tended to identify members of that Klavern as members of the mob that whipped Calloway were legal, but details of the organization and what was done at their meetings, not connected with the crime here charged, was res inter alios acta and irrelevant. There is no evidence in this record that tends to prove that any member of the Tarrant City Klavern ever knew or mentioned the name of Calloway prior to the time at Antioch Church, when he was taken by six men in robes and masks and whipped. There were some 40 or 50 of these robed figures in attendance upon the church services, and only 6 or 8 of them seem to have been involved in this crime.

So far as the evidence here discloses, the members of the Klan were at Antioch Church, in response to an invitation to attend a church service, and there is no evidence of any kind that tends to prove a preconcerted agreement to do other than the invitation indicates. It may be the facts are otherwise, but courts of justice must be governed by legal evidence.

The evidence in this case discloses that the witness Tidwell was particeps criminis to this crime; i. e., according to his testimony he did everything that any other member of the whipping party did except to actually apply the licks. In other words, he was a party to the crime, who on being first interrogated by the Attorney General denied all knowledge of the facts and subsequently "turned state's evidence." The defendant should have been permitted to prove on cross-examination of this witness that he had not been indicted or arrested on the charge which he admitted he had committed.

The court should not have made the disparaging remark which he did, regarding the testimony of defendant's witness Self. No rule of law is better known to the entire profession than that remarks to witnesses or comments on their testimony which tend either to magnify or diminish the effect of their testimony in the jury's estimation have a prejudicial character and are grounds for reversal. Hyatt on Trials, p. 1102; Daggett v. Boomer, 210 Ala. 673, 99 So. 181; Rigell v. State, 8 Ala. App. 46, 62 So. 977; Pate v. State, 19 Ala. App. 243, 96 So. 649.

The state was permitted to prove by a physician testifying as an expert that some time after the alleged whipping he had ex-

amined Calloway; that he was suffering from a nervous breakdown and in his opinion such condition was superinduced by the flogging. This evidence was irrelevant, for while the fact of the flogging was admissible, the severity thereof was not relevant. But having admitted this evidence the court should have permitted defendant to have inquired of the witness if excessive drinking of intoxicating liquor did not contribute to the condition. Craven v. State, 22 Ala. App. 39, 111 So. 767; Taylor v. State, 20 Ala. App. 161, 101 So. 160.

The state was permitted over timely objection and exception of defendant to prove that Chester Clayton told witness to keep his mouth shut about this matter. This was after the crime had been completed and at a time and place where defendant was not present. It was not in any way shown that defendant participated in the act of Chester telling witness to keep his mouth shut, and, while there was some evidence tending to connect Chester with the commission of the crime here charged, that crime had been completed and this defendant was not at this time bound by the act of his coconspirators. Leverett v. State, 18 Ala. App. 578, 93 So. 347.

We have already said that the res gestæ of this crime included what happened in the yard at Antioch Church, the place of the whipping, and all intervening points; that everything said and done during the progress of this crime and related thereto is a part of the res gestæ. Therefore the administration of an oath binding Hughes to secrecy at or near the place of the whipping was relevant.

There was a line of inquiry admitted by the court over the objection and exception of defendant tending to prove that after the crime had been committed this defendant called certain parties together and instructed them not to give evidence or to reveal anything they knew. This is not error. The activity of defendant in undertaking to suppress evidence or to hinder the authorities in the investigation of the crime is relevant and admissible as tending to prove a consciousness of guilt, but is not the same as a confession or incriminatory admission. The laying of a predicate for this line of inquiry was not necessary.

Charge 4, refused to defendant, asserts a correct proposition of law, and its refusal is error. Hammond v. State, 147 Ala. 79, 41 So. 761; Stinson v. State, 10 Ala. App. 110, 64 So. 507; Burkett v. State, 154 Ala. 19, 45 So. 682. Refused charge 5 should have been given, and its refusal was error. Leatherwood v. State, 17 Ala. App. 498, 85 So. 875.

Refused charges 12 and 12-A under the facts in this case should have been given, and the refusal of these charges constitute error.

Gilbert v. State, 20 Ala. App. 565, 104 So. 45; Baxley v. State, 18 Ala. App. 277, 90 So. 434. Without the testimony of the two witnesses named in these charges the state would have been left without sufficient evidence to sustain a conviction.

Refused charge 26 is held to be good and its refusal reversible error in the following cases: Baker v. State, 19 Ala. App. 437, 97 So. 901; Brown v. State, 118 Ala. 111, 23 So. 81; Gregory v. State, 140 Ala. 16, 37 So. 259; Howard v. State, 151 Ala. 22, 44 So. 95. Refused charge 34 was held to be good in Stewart v. State, 133 Ala. 105, 31 So. 944; Croft v. State, 95 Ala. 3, 10 So. 517.

Refused charge 38 is held to be a good charge in Olden v. State, 176 Ala. 6, 58 So. 307; Bell v. State, 115 Ala. 25, 22 So. 526. Refused charges 42 and 43 are held to be good in Gregg v. State, 106 Ala. 44, 17 So. 321, but the Gregg Case is overruled in Brown v. State, 142 Ala. 287, 38 So. 268; Latikos v. State, 17 Ala. App. 592, 88 So. 45.

Refused charge 53 correctly states the law as applicable to the facts in this case, and should have been given. Camillieri v. State, 19 Ala. App. 521, 99 So. 66. Refused charges 55, 61, and 63 are covered by the court in his general charge. Refused charge 64 is held to be good in Suttle v. State, 19 Ala. App. 198, 96 So. 90, and authorities there cited.

Those charges requested by defendant instructing the jury that under the evidence they could not find the defendant guilty of unlawfully confining Calloway with the intent to cause him to be sent out of the state against his will should have been given. Under the evidence in this case, Calloway was unlawfully and forcibly confined against his will, if at all, for the unlawful purpose of giving him a flogging. Whether the confinement was intended to be secret and whether this defendant was a guilty agent in the carrying out of that purpose were questions for the jury.

The statutes of this state will not permit a conviction to be based upon the testimony of an accomplice unless such testimony is corroborated by other testimony material to the guilt of the defendant, and must not relate merely to the commission of the offense. Harris v. State, 21 Ala. App. 67, 105 So. 387. The test as to whether a witness is an accomplice, within the meaning of the law is, Could the witness have been indicted and convicted of the offense either as principal or accessory? If he could he is an accomplice. Ash v. State, 81 Ala. 76, 1 So. 558; Belser v. State, 16 Ala. App. 504, 79 So. 265. In this case, and according to the above rule, both Hughes and Tidwell were accomplices, and this defendant could not be legally convicted without independent corroborating evidence. The state acquitted itself of this burden by the identi-

fication of a certain Chevrolet car and proving that Clayton, the defendant, went to the Antioch meeting in this car, together with some other slight circumstances tending to show the defendant's participation in the crime. None of these circumstances were sufficient within themselves, but were sufficient corroboration of the two state's witnesses. For the above reason the general charge as requested by defendant was properly refused.

The Attorney General in his oral argument insisted that all errors committed by the trial court were without prejudicial injury, because, under the undisputed evidence in this case, the state is entitled to the general affirmative charge. Even a casual review of this record will show this contention to be untenable. The case of the state depends upon the testimony of Hughes and Tidwell, with some slight corroboration, just enough to meet the requirements of the statute as to corroboration of accomplices. These witnesses were accomplices, there was evidence tending to impeach the testimony of Tidwell and Hughes by contradictory statements, and there was evidence as to the bad character of Hughes generally and as to truth and veracity. The identity of this defendant rested upon the testimony of these two witnesses, and the defendant proved a good character. If for no other reason, the proof of defendant's good character, to be considered along with all the other evidence in the case, would make the guilt of defendant a question for the jury. The general character of defendant, in a proper case, is competent as original testimony, as a circumstance to be considered in determining whether he is guilty of the crime charged, and may be considered, in connection with the other facts and circumstances, to generate a doubt in the minds of the jury. Goldsmith v. State, 105 Ala. 8, 16 So. 933; Felix v. State, 18 Ala. 725; Newsome v. State, 107 Ala. 133, 18 So. 206. The whole question was for the jury, and the state was not entitled to the affirmative charge.

Charge 50 given at the request of the state was also error. The charge was misleading. The testimony of Creel related entirely to the identity of defendant in a certain Chevrolet car while going to and arriving at Antioch Church some hours before Calloway was seized. This testimony was but a link in a chain of circumstances which, when connected, tended to corroborate the witnesses Hughes and Tidwell, and, taken alone, was of no value and would not have been admissible in evidence.

Charge 51 given at the instance of the state was misleading and should not have been given. Under the facts of this case there were many facts and circumstances tending to connect Hughes with the crime charged. Indeed, the jury was authorized to conclude from the whole evidence that

Hughes was as much guilty as was the defendant.

It may be that in the mass of charges given at the request of defendant there may be some embracing the same principles of law as in some of those refused, but there are no duplicates and if the others are there we have failed to find them, and the state has not pointed them out, by brief or otherwise.

There are many other questions presented by this record which we have thought unnecessary to pass upon on this appeal. On another trial at a time far enough removed from the time of the crime to allow the passions and minds of the public, from whom the jury must be selected, to become calm, the questions here omitted will not likely arise.

For the errors pointed out the judgment is reversed and the cause is remanded.

Reversed and remanded.

RICE, J. (dissenting). I respectfully dissent from the judgment of reversal in this case.

In the case of Doss v. State (Ala. App.) 123 So. 237,[1] a case, of which this is correctly termed, in the opinion by SAMFORD, J., a "companion" case, I have set forth, very briefly, my views as to those matters held by the majority to be error, which in my opinion, would not have been rendered harmless had the state been entitled to have given at its request, on the facts, the general affirmative charge in its favor. I adhere to those views.

In this case there is no question as to a lack of testimony corroborating that of the accomplices. Here, in my opinion, every element of the offense of kidnapping, as that offense is defined by statute, was shown by the clear, positive, undisputed, and uncontradicted legal evidence offered by the state. This being true, the only material question was: Did the jury believe the evidence beyond a reasonable doubt? As I see it, neither this question, nor its answer, would have legally in any wise been altered had every ruling, other than those as to the demurrers to the plea in abatement and to the indictment, neither of which I think was erroneous, held for error by the majority, been changed by the trial court to meet the objections of appellant. This being true, it seems to me, clearly, that the judgment of conviction appealed from should be affirmed. Vaughan v. State, 21 Ala. App. 204, 107 So. 797; Al. Henry Vaughan v. State, 214 Ala. 384, 107 So. 799. Supreme Court Rule 45; Code 1923, vol. 4, p. 895; Snyder v. State, 20 Ala. App. 570, 104 So. 140; People v. Stennett, 51 Cal. App. 370, 197 P. 372.

---

[1] Post, p. 168.

BRICKEN, P. J., concurs in the conclusion. This is a companion case to that of Doss v. State (Ala. App.) 123 So. 237,[1] and my views are fully expressed in that case upon all questions wherein there appears conflict in these two opinions.

