Russell Crews was indicted for kidnapping one Pamela Gray. The jury found the appellant guilty of kidnapping "as charged in the indictment", and the trial court entered judgment which set sentence at six years imprisonment in the penitentiary. Pamela Gray stated that she was sixteen years of age on November 12, 1978, and resided at 1103 Meharris Drive in Dothan, Alabama with her mother and father.
Pamela stated that she received a phone call from her friend indicating that Russell Crews was home for the weekend and staying at the Travel Motor Lodge and that he had been sick. Pamela indicated that after going to church she went by the motel to see him. She indicated that he wanted her to go back to the Air Force base in Texas with him where he was then stationed.
From the record, Pages 3A — 8:
"Q. Tell us what happened when you got there?
"A. When I got there he let me in and he started to tell me to go with him back to his Air Force base and I told him I couldn't, and he got all upset after I told him I couldn't go. After I told him I couldn't go he decided he wasn't that sick, and I told him no. We started `rasseling and he took my keys from me and threw them over on the other side of the bed. He pushed me down on the bed and we were `rasseling and *Page 437 
he managed to take off my shoes and my skirt; he didn't take off my top, but he forced me to have sex with him.
"Q. What happened after that, Pamela?
"A. He heard someone coming to the room and he pushed me off the bed and pushed me in the bathroom and he told me I better not scream; and he went and checked and there was not anyone and came back in and asked why didn't I want to go with him. I told him I couldn't, because of school and I was not ready to leave. He had really got upset then and we went back in the other room and I put on my shoes and got the rest of my stuff in my hand. He had put a chair in front of the door and I sat down in the chair, and I kept telling him I just couldn't go with him and he started crying. And he told me he had money and he would take care of me and I still told him I couldn't go with him. At the time he was sitting in front of me with the air-conditioner over my head and the cord was hanging down in front of me and I thought I could get his attention and run from him, but it wouldn't come down. We sat there and he kept saying `come on and go with me.' Then he moved away and sat on the farther side of the bed and that is when I ran out.
"Q. Where did you run?
"A. To the car.
"Q. Whose car was that, Pamela?
"A. My brother's car.
"Q. Is this place, the Travel Motor Lodge, is that here in Houston County, Alabama?
"A. Yes.
"Q. When you got to the car, what happened then?
"A. He was right behind me and I grabbed the steering wheel and tried to hold on and he pulled me and I fell and he dragged me and was kicking me.
"Q. What did you do to try to stop him from dragging you back in?
"A. I was kicking and holding on.
"Q. What did you hold on to?
"A. I was holding on to the bumper of the car.
"Q. Did you try to scream and cry out?
"A. Yes, and when I got back in the room, he started hitting me with his fist in the head, and I fell and couldn't think straight. When I was on the floor I heard him ripping up something and he started tying up ankles with the sheets off the bed. And he tied up my arms and tied up my mouth and he told me not to scream. He said why did I scream — `you didn't have to scream.' And then he pulled the mattress down on top of me, I was on the floor, and he went outside and I heard the car crank up and he backed the car up to the door and the trunk was up and he came back in and he said, I'm sorry, but you are going to have to ride in the trunk. I tried to scream and he threw me on the bed and stuck his finger in my mouth and told me not to scream. I tried to scream again and he put his finger in my nose and he said, "I warned you not to scream and he put me in the trunk and closed the door — closed the trunk — and drove away. And he didn't let me out until two hours after that, on some dirt road, in the country.
"Q. He was on a dirt road when he opened the trunk?
"A. Yes, it was somewhere in the country.
"Q. After he opened the trunk, what did he do then?
"A. He started questioning me, asking me why did I scream. While I was in the trunk, he kept hollering back to me; I could hear him, asking why did I scream. He said I didn't have to scream. He just kept asking me the same questions. He said `what are you going to do' and I told him I didn't know. I asked him to untie my wrists because my wrists were being cut and he untied me and let me out the trunk, but I was still tied by the ankles.
"Q. After he let you out of the trunk, where did he put you?
"A. Sit in the car.
"Q. Did he put anything over you at that time? *Page 438 
"A. No.
"Q. Were you still tied at that time?
"A. Yes.
"Q. And how were you tied, Pamela?
"A. My arms were behind me and my feet were tied together. He made me lean towards him and he dared me to get over close to the doorknob of the car, or else. That is all he would say `or else.' He would never tell me what he would do.
"Q. That first night, where did he take you to then?
"A. The Shamrock Motel, In Mississippi.
"Q. Was it a hotel or motel?
"A. A motel.
"Q. How did he get you to check in the motel?
"A. He didn't, he parked the car where he could walk to the door, and there was a window where he could look right out, and I was still tied up. It was late and the man, you know, it took him a while to get there. He never did look in the car to see me. When he got the room, it was on the front where everything was. He didn't untie me, he just backed the car up to the door and made me walk backwards to the room, so no one could see the things on my arms. When I got in there he tied me to the bed-post.
"Q. Did that leave any kind of burns on you when he tied you up?
"A. Yes.
"Q. Now, he tied you to the bed-post there in the room?
"A. Yes.
"Q. After you left there, where did you go?
"A. We didn't stop any more except to eat and he would cover me up with a blanket so nobody could see me when he stopped, and see that I was tied up. When he stopped to get gas, he would put me back in the trunk and dare me to say anything. I didn't say nothing, because I was scared that he wouldn't let me back out.
"Q. Where did you finally get to after you left Mississippi?
"A. We were in Texas and we stopped at another motel, called the Green Wave and my muscles were hurting so bad, he had to — he didn't tie me up no more, because I couldn't do anything, and he didn't do anything bad to me, just watched me, everything I did. He let me call home the next morning. I had begged him to let me call.
"Q. Before you called, did he tell you something he had heard?
"A. No.
"Q. Did he ever tell you anything he heard at the base?
"A. Before I called he told me to tell my mother to get him out of trouble and I did it on purpose, because I didn't want my mother to get him out of trouble, and she said —.
"MR. THOMPSON: I object to what she said.
"THE COURT: Yes, sustain the objection.
"Q. After the phone call, where did you go then?
"A. We were in Houston and went over to the Air Force Base, where he was.
"Q. Did he ever go in the Air Force Base while you were with him?
"A. Yes.
"Q. Where were you?
"A. In the car.
"Q. Did he take you with him?
"A. No, I would stay in the car.
"Q. What did you do when he would get out of the car?
"A. Nothing, he ran to the room and told me not to get out of the car and go no where and I didn't get out of the car.
"Q. Could you see him from where you were in the car?
"A. Yes.
"Q. Where would he be when you were in the car?
"A. He was upstairs; he showed me where his room was, on the top floor. I *Page 439 
tried to be nice so he wouldn't get mad with me.
"MR. THOMPSON: I object.
"THE COURT: I sustain the objection. It is not responsive to the question.
"Q. Pamela, how did you finally manage to get loose from him?
"A. It was raining one morning and the Sergeant called and told us to be in the office in the morning.
"Q. What did the Sergeant say, do you know?
"A. No, I didn't answer the phone. He answered the phone.
"Q. What happened?
"A. When we got down to the place, it was raining and he dropped me off in front.
"Q. Did Russell say that the Sergeant said for you to come to —?
"A. No, we had been down there one time already.
"Q. Why did you go down the first time?
"A. Because the Sergeant called and told him to bring me and for both of us to be down there.
"Q. He brought you in?
"A. Yes.
"Q. Where did he take you from there?
"A. After we went there, we left again and went back to the hotel and the Sergeant told us to be back at a certain time. When we came back it was raining and he dropped me off and I went in and told the Sergeant what really happened. He sent this lady in there and she took me off and then he came in and asked me to tell him what happened.
"Q. How did you get back home, Pamela?
"A. My mother wired me a plane ticket.
"Q. Did you see your mother when you got back home?
"A. When I got to Atlanta; they drove up to Atlanta.
"Q. Did you show her the injuries you had on you?
"A. Yes, sir.
"Q. Where did you have the injuries?
"A. I had bruises on my wrists and I had a bruise on my head.
"Q. Did your mother take you anywhere to have them seen about?
"A. We went to Dr. Crumpton."
On cross-examination Pamela testified that Jacquelyn Davis was the friend who telephoned her concerning Russell being back in Dothan. Pamela also indicated that she had known Russell for four or five years and had dated him from December, 1977, until around the first of August, 1978, when she broke up with Russell and soon thereafter he joined the Air Force. Pamela admitted discussing this incident with a girl named Sandra Danzy but denied threatening Sandra concerning testimony in the case.
Pamela stated the automobile was a Ford Granada in which she had been placed in the trunk and stated that she cried and he kept begging her to go to Texas. She admitted that she telephoned her mother from Texas and later had a conversation with Russell's sergeant and that he, too, had indicated to Russell that he had contacted Pamela's relatives in Alabama. Pamela admitted that she had been forbidden by her parents to see Russell, and this was because Russell, "used to beat me up over little stuff."
Dr. Marilyn Crumpton stated she was a Medical Doctor at Lyster Army Hospital at Fort Rucker and there in November, 1978, examined one Pamela Gray. This examination was on November 16, 1978. She stated that Pamela had bruises on her forehead which were relatively fresh; that she also had a burn cut on the right wrist and a burn cut on the right ankle which appeared to have been made by a rope or sheet.
Mrs. Carey Gray, mother of Pamela Gray, stated that she saw her daughter leave for church on Sunday, November 12, 1978, driving her brother's automobile. Mrs. Gray indicated that she saw her son's automobile late that afternoon at the Travel Motor *Page 440 
Lodge and the police were notified and asked to put out a bulletin as her daughter was missing. She next heard from her daughter on Tuesday morning by telephone call from Texas. She wired her daughter an airline ticket and met her early Thursday morning in Atlanta, Georgia. Mrs. Gray stated that Pamela had a bruise on her head, also one on her back, and bruises on her behind. She also noticed scratch or cut marks on her wrists and ankles. She took Pamela to Fort Rucker, Alabama, for examination by a medical doctor.
On cross-examination Mrs. Gray indicated that her daughter had left shortly before 11 o'clock on Sunday morning stating she was going to Sunday School. She also stated that her daughter had been forbidden from seeing Russell Crews as he had previously beaten her up.
Dothan Police Sergeant J.R. McCord testified that on November 12-13, 1978, he investigated a girl reported missing named Pamela Gray. He determined that one Russell Crews had been registered at the Travel Motor Lodge in Dothan and had checked out. He stated he received a complaint from Mrs. Carey Gray, mother of Pamela Gray.
At this point the State rested, and the defense began presenting its witnesses.
Sandra Danzy, a sixteen-year-old who attended Northview High School, stated she had known Pamela Gray for more than a year. She indicated that Pamela had told her between September and November, 1978, that she was going to Texas to make a surprise visit to see Russell Crews. She also stated that Pamela threatened to kick her "A__" if she testified as she had in court.
On cross-examination Sandra admitted that the statement made by Pamela had been made in September quite some time before the incident in November when she saw Russell at the motel in Dothan. She further stated that she was a friend of Russell Crews and believed that he was innocent and wanted to help him.
Jacquelyn Davis, age 18, stated she was a student at Northview High in Dothan and knew both Pamela Gray and Russell Crews. She stated she had telephoned Pamela Gray on Saturday shortly before 12 o'clock and told her that Russell was at the Travel Motor Lodge in Dothan and was sick, and that Pamela had replied that she wanted to see him and sure would try to come to the motel.
Russell Crews stated he was nineteen years of age and a resident of Dothan, Alabama, where he resided at 504 Allen Road. He stated he had joined the United States Air Force on August 21, 1978, and was stationed at Shepherd Air Force Base in Texas. He stated he had received a three-day pass in November and had come to Dothan, Alabama. He stated that he was registered at the Travel Motor Lodge and had contacted Pamela through a friend and that she came by the motel on Saturday, November 11, and saw him for about two hours. Russell Crews stated that when Pamela returned on Sunday, shortly after 1 o'clock, that both of them were very glad to see each other and that Pamela was quite upset stating she had cancer and that a doctor had told her that she didn't have much longer to live. He stated that she hugged him and said that she just wanted to be with him. He stated that he asked her to marry him and that they cried and hugged and had intercourse with each other. Later he said that they were talking and that she was seated on the arm of a chair and that she suddenly ran outside saying, "no, no." Russell stated that he went outside after her and that she began screaming and started to honk the horn. He stated that she tripped over his feet and struck her head and didn't move. He stated that he didn't know exactly what to do, that he must have panicked and that he took some sheets off the bed and tied her hands and feet but placed her on the back seat of the car. He stated that he covered her with a blanket and then picked up his suitcases and clothing and put them in the trunk of the car and checked out and began driving. He stated that he stopped soon after and that she asked him where were *Page 441 
they, that she had blacked out. He told her they were at a point near Montgomery because he had passed by the State prison there one night. They then decided to drive toward Mobile and then crossed over into Mississippi where they spent the night in a motel. The next day they drove into Texas and he stopped in Orange, Texas, and allowed Pamela to call her home in Dothan. Russell stated that he was stationed at Shepherd Air Force Base at Wichita Falls, Texas, and they went and checked into a motel near the air force base. Russell stated that he talked with his sergeant and told him that Pamela had caught a bus and come half way over and that he had gotten a car and gone to meet her. Russell insisted that he tied her up only to keep her from hurting herself; that he thought she was having something like a convulsion or fit. He stated that he had flown from Texas to Dothan and drove back to Texas in his mother's automobile.
On cross-examination Russell admitted tying Pamela's hands with strips from a sheet which he tore and stated that she was out cold at this time. He denied however tying her feet or placing her in the trunk of the automobile. He also denied stopping on a country road with her or hearing her screaming from the trunk. Russell admitted on cross-examination that he had told one of his fellow air force men that Pamela had come out on a Greyhound bus and that he had met her in Houston. Russell admitted on cross-examination that the last words Pamela stated were "no, no" when he tied her hands at the motel room in Dothan and forced her back into the room screaming. Russell denied ever stating to any friends that the word was out that he had kidnapped a girl and that was why he allowed her to telephone her mother. Russell also denied any conversation concerning ransom. Russell Crews admitted on cross-examination that soon after Pamela talked with his sergeant in Texas, that he was arrested. Russell stated that while en route to Texas, Pamela never did ask to go back to Alabama. He did admit that he untied her after they got to Texas. Following his own testimony, the defense rested.
There was an extensive oral charge given by the trial court to which both sides announced "Satisfied."
At the close of the evidence defense counsel asked for the affirmative charge and the affirmative charge with hypothesis, both of which were refused by the trial court.
 I
The appellant contends that the State failed to prove a prima facie case of kidnapping and that there was no intent to secrete or confine Pamela Gray. The two leading Alabama cases on the subject of kidnapping are Doss v. State, 23 Ala. App. 168,123 So. 237, cert. denied 220 Ala. 30, 123 So. 231, andClayton v. State, 23 Ala. App. 150, 123 So. 250, cert. denied220 Ala. 39, 123 So. 236 (1929). Former Presiding Judge Bricken traces the legislative history of the kidnapping statutes in Alabama in Doss, supra, and concludes his analysis in the following language:
 "We therefore conclude that the legislative intent was to punish the forcible and unlawful confinement of another, with the intent to cause him to be secretly confined against his will, in the first instance, or with the intent to cause him to be secretly imprisoned against his will, or with the intent to cause him to be sent out of the state against his will. People v. Camp, 139 N.Y. 87, 34 N.E. 755."
In Holman v. State, 36 Ala. App. 474, 59 So.2d 620 (1952) former Presiding Judge Carr discusses the Biblical history of the subject of kidnapping and then points out the common law in crime and the basic ingredient of the offense in these words:
 "At common law the crime of kidnapping consisted of the stealing and carrying away of any person from his own country. The element of forcible abduction is made essential.
 "Basically, the prime ingredient of the offense is the taking or detaining of a person against the subject's will and without authority of law."
In Patzka v. State, Ala.Cr.App., 348 So.2d 520 (1977) Judge Leigh Clark made the following observation: *Page 442 
 "A valuable aid to an understanding of the crime of kidnapping for which appellant was tried is Judge Bookout's opinion in Ball v. State, 335 So.2d 230
(Ala.Cr.App. 1976). In therein reversing the trial court, it was made clear that in kidnapping under Tit. 14, § 6, Code of Alabama 1940, more is necessarily involved than the unlawful detention or seizure of the body of another that is often involved in an assault, an assault and battery, rape, or robbery. It is not a mere false imprisonment. There must be `an intent to secretly confine or imprison.'"
Where the evidence in a kidnapping case has not been sufficient to make out a case the Alabama courts have not been hesitant to reverse same. See Doss and Clayton, supra, as well as Holman v. State, supra. See also Hubbard v. State,23 Ala. App. 537, 128 So. 587 (1930) and Ball v. State, Ala.Cr.App., 335 So.2d 230 (1976).
In the case at bar, however, the evidence is clear that from the testimony of Pamela Gray, she had been forbidden to see Russell Crews and that he struck her and drug her back into the motel after she attempted to leave on Sunday afternoon. The evidence also shows that he bound her with strips of sheet torn from the bedding and placed her into the automobile. His own testimony indicates that he placed her on the back seat of the car and drove away from Dothan, and that she later came to and stated that she blacked out. Her testimony is to the effect that she was placed in the trunk of the car and beat upon the car and began screaming after she came to and that he stopped in a wooded area and finally placed her in the automobile though she was still bound. According to Pamela Gray's testimony, and also the appellant's, the two of them drove over to Mississippi and spent the night in a motel there. Pamela Gray's testimony indicates that she was tied to a bed post while in Mississippi.
Pamela Gray was allowed to telephone her mother from Orange, Texas, on Tuesday following the parties leaving Dothan on Sunday. It is clear from the cross-examination of appellant and from the testimony of Pamela Gray that the appellant was in some difficulty with the Air Force authorities over bringing Pamela to Texas.
Examination by a medical doctor indicated cuts and bruises on the person of Pamela Gray showing that she had been bound against her will. We find there was abundant evidence to support a finding that the forcible conduct of the defendant as directed toward Pamela Gray, his victim, was with the necessary intent to cause her to be secretly confined or imprisoned within the meaning of the Alabama statute.
We are clear to the conclusion that the trial court properly overruled the appellant's request for the affirmative charge and the affirmative charge with hypothesis and the State therefore correctly presented a prima facie case. Patzka v.State, Ala.Cr.App., 348 So.2d 520 (1977).
 II
The appellant contends he was denied due process of law because he was convicted of an offense for which he had not been indicted. Specifically, the appellant contends the indictment in the case at bar did not aver that Russell Crews kidnapped the victim "by forcibly and unlawfully confining her with the intent to cause her to be sent out of state against her will."
As pointed out by Judge Bookout speaking for the court inStringer v. State, Ala.Cr.App., 372 So.2d 378 (1979) cert. denied, Ala., 372 So.2d 384:
 "The proper procedure to challenge the validity of an indictment is by demurrer. Andrews v. State, Ala.Cr.App., 344 So.2d 533, cert. denied, Ala., 344 So.2d 538 (1977). This the appellant did not do, and he now raises this issue for the first time on appeal. Ordinarily one waives any irregularities in the indictment by appearing and pleading in the trial court, and a plea to the merits is considered as an admission of a valid indictment. Johnson v. State, 49 Ala. App. 389, 272 So.2d 597 (1973); Elliott v. State, 39 Ala. App. 314, 98 So.2d 618 (1957). `However, due process dictates that a defect associated *Page 443 
with an essential element of the offense which leaves the accused unaware of the nature and cause of the charge against him cannot be waived by failure to timely demur.' Andrews v. State, supra. Such a fatal defect is not present in the instant indictment."
Moreover, in the case at bar, as noted in Doss v. State, there are three possible intents which may be proven under a kidnapping indictment in Alabama. The evidence in the case at bar, as noted in Proposition of Law I fully sustains the necessary elements as set forth above.
Not only is the matter not properly presented, inasmuch as there was no challenge to the indictment in the trial court, but the evidence fully sustains and supports the allegations of the indictment.
We have carefully examined this record and find same to be free of error. The judgment is affirmed.
AFFIRMED.
All the Judges concur.