878 So.2d 1216 (2003)
Andrew Lee SULLENS and Terry Lee Sullens
v.
STATE of Alabama.
CR-01-0968.
Court of Criminal Appeals of Alabama.
March 21, 2003.
Rehearing Denied May 16, 2003.
Certiorari Quashed October 10, 2003.
*1217 Charles A. Flowers III, Birmingham; and Gerald Gregory White, Birmingham, for appellants.
*1218 William H. Pryor, Jr., atty. gen., and G. Ward Beeson III, asst. atty. gen., for appellee.
Alabama Supreme Court 1021471.
BASCHAB, Judge.
The appellants, Andrew Lee Sullens and his father Terry Lee Sullens, were convicted of discharging a firearm into an occupied vehicle, a violation of § 13A-11-61(a), Ala.Code 1975.[1] The trial court sentenced them to serve terms of 10 years in prison, but split the sentences and ordered them to serve 60 days in the Jefferson County Jail followed by 5 years on supervised probation. Terry filed a motion for a new trial, which the trial court denied after conducting a hearing. This appeal followed.
The evidence showed that, in February 2001, James Weems ("Jimmy") lived in a house with his wife, Valerie Weems; his stepson; his stepdaughter, Erica Holcomb; Elizabeth Hurt; and Hurt's fiance, Daniel Lovell. Jimmy testified that, late in the evening on February 22, 2001, he learned that Erica was leaving and would not be living in the house any longer. When he went outside, Erica was already gone. However, he saw a vehicle "parked just above our driveway." (R. 67.) He stated that Andrew was in the backseat of the vehicle and that he had what appeared to be a 12 gauge shotgun in his lap.
Because Jimmy wanted to talk to Erica, he and Elizabeth drove to the Sullens' residence. He parked in the road near the driveway and walked toward a vehicle that was parked in the driveway. Eddie Franks, Erica's boyfriend, was sitting in the front passenger side of the vehicle, and Andrew was sitting in the backseat on the driver's side. Jimmy tried to pull Eddie out of the vehicle, but he was not able to do so. At that point, Andrew "got out of the vehicle with his gun and attempted to intervene." (R. 74.) Afterward, Eddie walked around the vehicle, and Jimmy approached Andrew. Jimmy and Andrew "started exchanging words," Jimmy approached Andrew and asked him "if he was going to shoot an unarmed man," and Andrew said, "`Yes, if I have to.'" (R. 76.) During all of this time, the men were exchanging profanities. Also, during this time, Terry came out of the house "carrying a .38 Special." (R. 78.)
Jimmy and Eddie then "got into it again," and Jimmy approached Eddie. (R. 77.) At that point, Andrew stepped back, chambered a round in his shotgun, and said, "`Eddie, back up, I don't want you in the spread." (R. 77.)[2] Elizabeth then approached Jimmy and eventually got him to move back toward his vehicle. Andrew and Terry followed them to the vehicle, and Terry told them that they were not leaving, that they were under citizen's arrest, that law enforcement authorities were on their way, and that he would shoot if they tried to leave. Jimmy cursed at Terry, got into the driver's seat of his vehicle, and cranked the vehicle. Terry walked in front of and to the left of the vehicle to keep Jimmy from leaving, but Jimmy went around Terry on the right and started driving down the road. As he did, "they opened fire on" him. (R. 82.) At least one round hit the vehicle and shattered the glass, another round hit a tire, and several other rounds hit various places on the vehicle.
Jimmy and Elizabeth both testified that they were initially told to leave because law enforcement authorities had been *1219 called. They also testified that Jimmy did not have a weapon at any time during the confrontation. Finally, Elizabeth testified that Jimmy did not hit Terry with his vehicle as he was driving away, and Jimmy testified that he did not believe he hit Terry with his vehicle as he was driving away.
Terry testified that he agreed to let Erica move into his house. He also testified that he "was told that [Jimmy] was known to be violent and there was a possibility that he would be upset if she left the house." (R. 316.) Subsequently, Andrew, his son, called him on a two-way radio, told him there was trouble outside, and asked him to call law enforcement authorities. He called law enforcement authorities and then went outside to find out was happening. At that time, he saw Jimmy "butting up against Andrew repeatedly knocking him backwards" and "cussing as loud as he could." (R. 317.) He went into the house, retrieved a revolver, and returned to the yard, where Jimmy and Andrew were moving toward Jimmy's vehicle. Jimmy turned toward him and told him he was not going to be able to protect his family. Terry testified that he "felt extremely threatened for [his] family's safety" and that he went toward Jimmy's vehicle to get his license plate number. (R. 319.) After he got the number, he started walking around the front of the vehicle to return to his house, and he heard Andrew "holler out, `Citizen's arrest.'" (R. 321.) He testified that, as he walked in front of the vehicle, Jimmy started turning the steering wheel in his direction and that the vehicle started moving toward him. He further testified that Jimmy's vehicle hit him and spun him around. Afterward, he "instinctively ... started shooting down there at the tire" and fired five times. (R. 323.) He testified that he did not ever threaten to shoot Jimmy and Elizabeth. Finally, he admitted that he did not see Jimmy with a weapon.
Andrew testified that he and his wife went with Eddie to pick Erica up from the Weems' residence. However, he stated that he did not have a weapon in his vehicle at that time. He also testified that, because he had heard that Jimmy had a reputation for being violent and because he knew Jimmy might follow them to his house or to Eddie's house, he got his shotgun after he returned to his house. When Jimmy arrived, he and Eddie were in a vehicle, and he radioed for his father to call law enforcement authorities. Jimmy confronted Eddie, and Andrew got his shotgun and got out of the vehicle. Eventually, Jimmy left Eddie, approached Andrew, and yelled in his face about shooting an unarmed man. Andrew told him he would shoot if he had to, and Jimmy "chest-butt[ed]" him five or six times. (R. 363.) Jimmy then told him he could not protect his family and Eddie, and he refocused his attention on Eddie. Terry came out, announced that law enforcement authorities were on their way, and went to get Jimmy's license plate number. Elizabeth and Jimmy then got into the vehicle, and Jimmy continued to use profanities. Andrew told Jimmy not to leave because he was under citizen's arrest, and Jimmy lunged at him and yelled more profanities at him. Andrew moved away from the vehicle, and Terry walked toward the front of the vehicle. The vehicle then started moving toward Terry and eventually hit Terry. "[B]ecause [he] thought that [Terry's] life was in danger," Andrew started shooting at the vehicle to stop it, and he fired three shots. (R. 370.) He also testified that he heard Terry start shooting "[j]ust a split second before" he started shooting. (R. 378.)
Eddie testified that Jimmy tried to get him out of the vehicle, but he was not able *1220 to do so, and Andrew told him to stop. At that point, Jimmy walked around the vehicle toward Andrew, "chest-butt[ed]" Andrew four or five times, and asked if he was going to shoot an unarmed man. (R. 277.) Afterward, Elizabeth and Jimmy fell, and Jimmy refocused his attention on Eddie. Eddie testified that Jimmy "had some kind of metal ring around his hand ... [a]ll the way across his knuckles," that he starting pushing him on the chest with his fist, and that he stated, "`[Y]ou are mine.'" (R. 279.) They exchanged more words, and Jimmy walked toward his vehicle. While he was doing so, he made a comment about Andrew's father not being able to protect his family. Eddie looked away briefly, and when he turned around, he "noticed that the truck was pulling away and [Terry] had been actually moved from where he was at by the truck to over a few feet away. And then Andrew was  had opened fire on the vehicle at that time." (R. 281.) Eddie testified that he also saw Terry firing at the vehicle. Finally, he testified that he did not hear Terry or Andrew threaten to shoot Jimmy and Elizabeth.

I.
The appellants argue that the indictments against them were defective because they did not allege a culpable mental state. The indictment against Andrew alleged that he
"did shoot or discharge a firearm, explosive or other weapon which discharges a dangerous projectile, to-wit: a shotgun, into an occupied dwelling, building, railroad locomotive, railroad car, aircraft, automobile, truck or watercraft, to-wit: a truck, while said truck was occupied by JAMES LEE WEEMS and ELIZABETH HURT, in violation of Section 13A-11-61 of the Alabama Criminal Code, against the peace and dignity of the State of Alabama."
(C.R.7.) The indictment against Terry alleged that he
"did shoot or discharge a firearm, explosive or other weapon which discharges a dangerous projectile, to-wit: a pistol, into an occupied dwelling, building, railroad locomotive, railroad car, aircraft, automobile, truck or watercraft, to-wit: a truck, while said truck was occupied by JAMES LEE WEEMS and ELIZABETH HURT, in violation of Section 13A-11-61 of the Alabama Criminal Code, against the peace and dignity of the State of Alabama."
(C.R.34.) Section 13A-11-61, Ala.Code 1975, provides:
"(a) No person shall shoot or discharge a firearm, explosive or other weapon which discharges a dangerous projectile into any occupied or unoccupied dwelling or building or railroad locomotive or railroad car, aircraft, automobile, truck or watercraft in this state.
"(b) Any person who commits an act prohibited by subsection (a) with respect to an occupied dwelling or building or railroad locomotive or railroad car, aircraft, automobile, truck or watercraft shall be deemed guilty of a Class B felony as defined by the state criminal code, and upon conviction, shall be punished as prescribed by law.
"(c) Any person who commits any act prohibited by subsection (a) hereof with respect to an unoccupied dwelling or building or railroad locomotive or railroad car, aircraft, automobile, truck or watercraft shall be deemed guilty of a Class C felony as defined by the state criminal code, and upon conviction, shall be punished as prescribed by law."
The indictments track the language of § 13A-11-61(a), Ala.Code 1975. However, that statute does not include a specific culpable mental state. Therefore, we must *1221 determine whether a violation of § 13A-11-61, Ala.Code 1975, is a strict liability offense.
Section 13A-2-4(b), Ala.Code 1975, provides:
"Although no culpable mental state is expressly designated in a statute defining an offense, an appropriate culpable mental state may nevertheless be required for the commission of that offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such culpable mental state. A statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, states a crime of mental culpability."
(Emphasis added.) The Commentary to § 13A-2-4, Ala.Code 1975, states:
"Subsection (b) explicitly states a policy adverse to arbitrary use of `strict liability' concepts. An express statement is required in the statute defining the offense if strict liability is being imposed."
(Emphasis added.) Although § 13A-11-61, Ala.Code 1975, does not describe a culpable mental state, it also does not expressly state that discharging a firearm into an occupied vehicle is a strict liability offense. Furthermore, § 13A-11-61, Ala.Code 1975, was enacted in 1984, and we presume that the Legislature was aware of § 13A-2-4, Ala.Code 1975, and chose not to make the offense a strict liability offense. See Ex parte Phillips, 771 So.2d 1066 (Ala.2000). Therefore, we conclude that discharging a firearm into an occupied vehicle is not a strict liability offense.
We must next attempt to ascertain what mental state is required to commit the offense of discharging a firearm into an occupied vehicle. In this regard, § 13A-2-2, Ala.Code 1975, provides:
"The following definitions apply to this Criminal Code:
"(1) Intentionally. A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct.
"(2) Knowingly. A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of that nature or that the circumstance exists.
"(3) Recklessly. A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates a risk but is unaware thereof solely by reason of voluntary intoxication, as defined in subdivision (e)(2) of Section 13A-3-2, acts recklessly with respect thereto.
"(4) Criminal negligence. A person acts with criminal negligence with respect to a result or to a circumstance which is defined by statute as an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation. A court or jury may consider statutes or ordinances *1222 regulating the defendant's conduct as bearing upon the question of criminal negligence."
In Ex parte Edwards, 816 So.2d 98 (Ala.2001), the Alabama Supreme Court faced the task of determining what mental state is required to commit the offense of vehicular homicide, as set forth in § 32-5A-192, Ala.Code 1975. Section 32-5A-192(a), Ala.Code 1975, provides, in pertinent part:
"Whoever shall unlawfully and unintentionally cause the death of another person while engaged in the violation of any state law or municipal ordinance applying to the operation or use of a vehicle, or vessel, as defined in Section 33-5-3, or to the regulation of traffic or boating, shall be guilty of homicide when the violation is the proximate cause of the death."
(Emphasis added.) The supreme court determined the following:
"We conclude that the trial court's initial reservations about tying the requisite mental state to the word `unlawfully' were sound. We endorse the `Use Note on Mens Rea Element' that accompanies the Alabama pattern jury instruction applicable to § 32-5A-192; that note states that `unintentional' is not defined in the Code but that the committee drafting the instruction assumes that word to refer to all forms of mens rea except that described by the word `intentional.' The Use Note then refers to the previously referenced defined terms governing mens rea elements  `intentionally,' `knowingly,' `recklessly,' and `criminal negligence.'11 Then, the Use Note correctly concludes:
"`The judge should insert the appropriate mens rea element considering the indictment and the evidence before the court. "There are few, if any, strict liability offenses in this Criminal Code...." Ala.Code § 13A-2-3 Commentary. See also § 13A-2-4(b).'
"Alabama Pattern Jury Instructions: Criminal, 14-4 to 14-6 (3d ed.1994).
"11Because § 32-5A-192(b) uses the word `unintentionally,' § 13A-2-2(1), defining `intentionally,' has no field of application."
Edwards, 816 So.2d at 107.
Unlike the vehicular homicide statute, § 13A-11-61, Ala.Code 1975, does not expressly exclude intentional conduct. In fact, it does not exclude any of the states of mental culpability set forth in § 13A-2-2, Ala.Code 1975. As did the Alabama Supreme Court in Edwards, we interpret the fact that the statute does not specifically exclude any states of mental culpability to be an indication of the Legislature's intent to include any of the states of mental culpability set forth in § 13A-2-2, Ala.Code 1975. Therefore, we conclude that the offense of discharging a firearm into an occupied vehicle can be committed intentionally, knowingly, recklessly, or with criminal negligence.
Finally, we must determine whether the trial court erred when it denied the appellants' motions to dismiss the indictments based on the fact that they did not allege a culpable mental state. For the reasons set forth below, we conclude that it did not.
In Duncan v. State, 624 So.2d 1084, 1087-88 (Ala.Crim.App.1993), we addressed a similar issue as follows:
"The appellant maintains that the indictment failed to charge an offense because it did not sufficiently inform her of what she was called upon to defend. The indictment in this case charged that the appellant,
"`a parent, guardian or other person legally charged with the care or custody of Kassie Larene Duncan, a child less than eighteen (18) years of age, did fail to exercise reasonable diligence *1223 in the control of Kassie Larene Duncan so as to prevent Kassie Larene Duncan from becoming a dependent, as defined [in] Section 12-15-1 of the Code of Alabama, by such conduct more particularly described as knowingly leaving said child in an abusive environment ... in violation of Section 13A-13-6 of the Code of Alabama.' CR. 1-2.
"Section 13A-13-6 provides, in pertinent part:
"`(a) [A] man or woman commits the crime of endangering the welfare of a child when:
"`....
"`(2) [H]e or she, as a parent ... of a child less than 18 years of age, fails to exercise reasonable diligence in the control of such child to prevent him or her from becoming a "dependent child" ... as defined in section 12-15-1.'
"Section 12-15-1(10) provides that a `dependent child' is one
"`a. Who, for any reason, is destitute, homeless or dependent on the public for support; or
"`b. Who is without a parent or guardian able to provide for his support, training or education; or
"`c. Whose custody is the subject of controversy; or
"`d. Whose home, by reason of neglect, cruelty or depravity on the part of his parent, parents, guardian or other person in whose care he may be, is an unfit and improper place for him; or
"`e. Whose parent, parents, guardian or other custodian neglects or refuses, when able to do so or when such service is offered without charge, to provide or allow medical, surgical or other care necessary for such child's health or well-being; or
"`f. Who is in such condition or surroundings or is under such improper or insufficient guardianship or control as to endanger his morals, health or general welfare; or
"`g. Who has no proper parental care or guardianship; or
"`h. Whose parent, parents, guardian or custodian fails, refuse[s] or neglect[s] to send such child to school in accordance with the terms of the compulsory school attendance laws of this state; or
"`i. Who has been abandoned by his parents, guardian or other custodian; or
"`j. Who is physically, mentally or emotionally abused by his parents, guardian or other custodian or who is without proper parental care and control necessary for his well-being because of the faults or habits of his parents, guardian or other custodian or their neglect or refusal, when able to do so, to provide them; or
"`k. Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child; or
"`l. Who has been placed for care or adoption in violation of the law; or
"`m. Who for any other cause is in need of the care and protection of the state; and
"`n. In any of the foregoing, is in need of care or supervision.'
"The appellant claims that the indictment was defective because the allegation that she failed to prevent her child from becoming a dependent, `by such conduct more particularly described as knowingly leaving said child in an abusive environment' did not specifically *1224 track any of the fourteen alternatives found in subsections (a) through (n) of § 12-15-1(10), defining a `dependent child.'
"The appellant is correct that the phrase `knowingly leaving said child in an abusive environment' is not in verbatim correspondence with any one of the fourteen alternatives of § 12-15-1(10). Instead, the phrase appears to fit several of the statutory subsections, especially parts (d), (f), and (j).
"The indictment, however, need not have specified which of the § 12-15-1 subsections was applicable in order to have charged an offense. Generally, it is `sufficient to charge the elements of the statutory offense in the words of the statute [here, § 13A-13-6], provided the statute prescribe[s] with definiteness the constituent elements of the offense.' Ex parte Harper, 594 So.2d 1181, 1183 (Ala.1991). The allegation that the appellant `fail[ed] to exercise reasonable diligence in the control of Kassie Larene Duncan so as to prevent Kassie Larene Duncan from becoming a dependent, as defined [in] Section 12-15-1 of the Code of Alabama,' tracked the language of § 13A-13-6, and was itself legally sufficient.
"The fact that the indictment did not specify which of the § 12-15-1 alternatives was applicable did not render it fatally defective. An indictment that tracks the language of a statute that incorporates a word or phrase `defined by law' in another statute need not further clarify the incorporated word or phrase. See Inmon v. State, 585 So.2d 261, 263 (Ala.Cr.App.1991). This indictment stated an offense without alleging which of the § 12-15-1 subsections was applicable, and the appellant's motion to dismiss the indictment was correctly denied.
"While the appellant would have been, on timely motion, entitled to a more definite statement of the charge against her, she made no such motion `prior to the entry of her plea.' See Rule 13.2(e), A.R.Crim. P. Compare Ex parte Harper, 594 So.2d at 1183 n. 2 (wherein the Alabama Supreme Court observed that `Rule 13.2(e), A.R.Crim. P., provided th[e] defendant, had he requested it before joining issue on the indictment, the right to move for a more definite statement of the charge. Had such a procedure been available in Gayden [v. State, 262 Ala. 468, 80 So.2d 501 (1955), ("a leading case on the sufficiency of an indictment")], it appears that the result reached there would have been different').
"The appellant in fact received a more definite statement of the charge when the trial court instructed the jury that it should measure the appellant's conduct against the definition of `dependent child' contained in Ala.Code 1975, § 12-15-1(10)(f): a child `[w]ho is in such condition or surroundings or is under such improper or insufficient guardianship or control as to endanger his morals, health or general welfare.' R. 428. The appellant entered no objection to this portion of the court's charge. Because subsection (f) conforms to the evidence in this case, and because there is absolutely no indication that the appellant was misled in making her defense to the indictment charging that she `knowingly le[ft her] child in an abusive environment,' we find that, even if any error had been preserved, it would have been harmless."
Subsequently, in Hunt v. State, 642 So.2d 999, 1022-26 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994), this court again addressed a similar issue as follows:

*1225 "Hunt maintains that the trial court committed reversible error in failing to sustain his motion to dismiss the indictment. This issue is preserved for our review. In a supplement to his pretrial motion to dismiss, Hunt alleged that the indictment was `insufficient to charge a criminal offense in that it fails to allege that Hunt knowingly or willfully violated § 36-25-5, Ala.Code (1975), as required by § 36-25-27, Ala.Code (1975).' C.R. 485-486. In addition, Hunt filed a motion for more definite statement pursuant to Rule 13.2(e), A.R. Cr. P. in which this issue was presented. C.R. 477, 481. In response to this motion, the Attorney General filed a lengthy written response with extensive exhibits. C.R. 543-586.
"Appellate courts review the legal sufficiency of indictments de novo. United States v. Schmidt, 947 F.2d 362, 369 (9th Cir.1991).
"`The Federal Rules of Criminal Procedure require that an indictment be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." An indictment need only contain those facts and elements of the alleged offense necessary to inform the accused of the charge so that she may prepare a defense and invoke the Double Jeopardy Clause when appropriate. Courts will normally find an indictment insufficient only if it fails to state a material element of the offense.
"`In determining whether an indictment sufficiently informs the defendant of the offense, courts give the indictment a common sense construction and generally will uphold an indictment even if it contains a technical error or omission. Validity of the indictment turns on whether it conforms to minimum constitutional standards, not whether the indictment could be framed more satisfactorily. Although an indictment that tracks the statutory language defining an offense is usually sufficient, reliance on statutory language alone will not cure a fatal defect in an indictment.
"`.... The availability of a bill of particulars will not cure an indictment that omits an essential element of the offense.'
"Daniel F. McInnis et al., Project, Twenty-Second Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1991-1992, 81 Geo. L.J. 853, 1076-1081 (1993) (footnotes omitted).
"The indictment charged in pertinent part that Hunt
"`while a public official or employee, to wit: the Governor of the State of Alabama, did use an official position or office, to wit: the Office of the Governor of the State of Alabama, to obtain direct personal financial gain, to wit: two hundred thousand dollars ($200,000) in lawful currency and/or coinage of the United States of America and/or checks, a better description of which is unknown to the Grand Jury, for himself or his family or any business with which he or a member of his family is associated, said use and gain not being specifically authorized by law in violation of Section 36-25-5 of the Code of Alabama, against the peace and dignity of the State of Alabama.' C.R. 26.
"The statute under which Hunt was indicted, Ala.Code 1975, § 36-25-5(a), provides:
"`No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his *1226 family is associated unless such use and gain are specifically authorized by law.'
"Here, the indictment parroted the language of § 36-25-5(a). However, the penalty for this conduct is prescribed by § 36-25-27(a)(1) which requires that the conduct be `knowingly or willfully' committed. Section 36-25-27(a)(1) provides:
"`Any person subject to this chapter who knowingly or willfully violates any provisions of this chapter other than the requirements of financial and lobbying disclosure shall be found guilty of a felony and shall be fined not more than $10,000.00 or less than $2,001.00, or shall be imprisoned for not more than 10 years but not less than two years or any combination thereof.' (Emphasis added).
"It is undisputed, both at trial and on appeal, that `knowingly or willfully' is an element of the offense defined in § 36-25-5(a).
"....
"In [Ex parte] Harper, [594 So.2d 1181 (Ala.1991)], the Alabama Supreme Court held that an indictment alleging that the defendant `unlawfully' distributed a controlled substance was not void for failing to allege that the distribution was `knowingly' done. The Court recognized that knowledge was an element of the offense which should have been alleged in the indictment, but it held that the defendant had failed to raise a timely objection to that omission from the charge. The Court decided that `[e]ven if [the defendant] had a valid objection to the statement of the charge, and we find that he did not have a valid objection in this case, he failed to raise an objection timely.' Harper, 594 So.2d at 1194 (emphasis added).
"The court apparently had two reasons for determining that the defendant `did not have a valid objection' to the Harper indictment, despite the omission of the knowledge allegation. First, the court found it `important,' 594 So.2d at 1182, that `the procedure for preferring an indictment was governed by the provisions of Temporary Rule 15.2 [now Rule 13.2, A.R. Cr. P.].' Under that rule, `[t]he indictment or information shall be a plain, concise statement of the facts in ordinary language sufficiently definite to inform a defendant of common understanding of the offense charged and with that degree of certainty which will enable the court, upon conviction, to pronounce proper judgment.'
"`The general rule in Alabama, even before the adoption of Temporary Rule 15 (now Rule 13), was that it was sufficient to charge the elements of the statutory offense in the words of the statute, provided the statute prescribed with definiteness the constituent elements of the offense. Ex parte Allred, 393 So.2d 1030 (Ala.1980); see, also, cases collected at 12 Ala. Dig., Indictment and Information, Key No. 110(3). The crucial question, of course, is whether the indictment sufficiently apprises the accused with reasonable certainty of the nature of the accusation made against him so that he may prepare his defense, that he may be protected against a subsequent prosecution for the same offense. See Hochman v. State, 265 Ala. 1, 91 So.2d 500 (1956), in which the Court distinguished Gayden v. State, 262 Ala. 468, 80 So.2d 501 (1955), a leading case on the sufficiency of an indictment, in which a divided Court held that two counts of an indictment against Gayden were defective and subject to a demurrer.'
"Harper, 594 So.2d at 1183. The Court further noted that it `has liberalized *1227 criminal pleading and has provided a method for defendants to obtain a more definite statement of the charges [pursuant to Rule 13.2, A.R. Cr. P.].' Harper, 594 So.2d at 1183.
"Second, the court found that Temporary Rule 15.5(c)(2) [now Rule 13.5(c)(2)] provides for a `harmless error' review of a defective charging instrument.
"`The Court of Criminal Appeals correctly held, in Stewart [v. State, 580 So.2d 27 (Ala.Cr.App.1990)], that if a statute requires that the offense be "knowingly" committed, then the indictment should allege that it was so committed, and if an objection to the indictment is raised by the trial court or the defendant "during the pendency of the proceeding," the indictment is defective and would be subject to dismissal, unless otherwise provided for in Temporary Rule 15.5(c)(2) (now Rule 13.5(c)(2)), which states, in part, that "[n]o charge shall be deemed invalid, nor shall the trial, judgment, or other proceedings thereon be stayed, arrested, or in any manner affected, for any defect or imperfection in the charge which does not tend to prejudice the substantial rights of the defendant upon the merits."
"`.... Even if he had a valid objection to the statement of the charge, and we find that he did not have a valid objection in this case, he failed to raise an objection timely.
"`Based on the foregoing, we are clear to the conclusion that the defendant's constitutional right "to demand the nature and cause of the accusation" (Art. 1, § 6, Const. of Ala.1901) has been fulfilled in this case. The indictment is not void for failing to allege that the offense was committed "knowingly."
"`This opinion should not be construed, however, as stating that the State may not be required to prove that the defendant knew of the presence of a controlled substance,.... [K]nowledge must be proved in order to establish that an offense was committed.....
"`Based on the above, we hold that the indictment was not void for its failure to allege that the distribution of the controlled substance was "knowingly" done. We further hold that the petitioner's objection was untimely, because it was not made "during the pendency of the proceeding.'" (Emphasis added).
"Harper, 594 So.2d at 1194-95.
"From the above discussion we draw the following conclusions: 1) Knowledge or willfulness is an element of the offense defined in Ala.Code 1975, § 36-25-5. 2) Under Davis[v, State, 68 Ala. 58 (1880)], supra, knowledge or willfulness should have been alleged in the indictment. 3) After the adoption of Rule 13, A.R. Cr. P. and the opinion of the Alabama Supreme Court in Harper, the failure to allege criminal intent in an indictment does not necessarily render an indictment void and in some cases does not even render it objectionable even in those cases where criminal knowledge is necessary for the proof of the crime charged.
"Frankly, Harper raises many more questions than it answers. However, this Court is bound by the decisions of the Alabama Supreme Court. Ala.Code 1975, § 12-3-16.
"We conclude that Ex parte Harper ... controls the result in this case. Hunt was given a more definite statement of the charges against him, and the *1228 State presented evidence from which the factfinder could infer that Hunt committed the offense knowingly and wilfully. Therefore, any imperfection in the indictment did not `tend to prejudice [Hunt's] substantial rights upon the merits.' Rule 13.5(c)(2), A.R. Cr. P."
Finally, in Ex parte Edwards, 816 So.2d 98, 109 (Ala.2001), the Alabama Supreme Court, addressing a conviction under the vehicular homicide statute, stated: "Edwards's indictment did not describe a necessary culpable mental state, and the court refused her request for an instruction on a culpable mental state." As the appellants concede, "Edwards stands for the proposition that the trial court could have cured the indictment in its instructions to the jury." (Appellants' brief at p. 26.)
The indictments in this case substantially followed the language of § 13A-11-61(a), Ala.Code 1975.[3] In light of Alabama's liberalized rules of pleading, we conclude that the indictments sufficiently apprised the appellants of the nature of the charges against them so that they could prepare their defenses. Also, the appellants could have requested more definite statements of the charges against them, as did the appellant in Hunt. See also Duncan. Further, as in Duncan, the appellants received more definite statements when the trial court instructed the jury that it must determine whether the appellants acted "without lawful justification." (R. 492, 502.)[4] Finally, the record does not indicate that the appellants were misled in preparing their defenses to the indictments. In fact, from the record, it appears that they thoroughly prepared and presented their defenses  defense of others and self-defense  to the charges. Therefore, we conclude that any imperfection in the indictments did not tend to prejudice the substantial rights of the appellants.

II.
The appellants also argue that the trial court erred because it did not instruct the jury on the culpable mental state necessary to commit the offense of discharging a firearm into an occupied vehicle. Before its oral charge, the trial court read to the parties the instruction it intended to give on discharging a firearm into an occupied vehicle. However, the appellants did not object to the instruction at that time. (R. 459-60.) In fact, at that time, Andrew's attorney stated, "Fair enough, Your Honor." (R. 460.) Also, the appellants did not object to the instruction after the oral charge.
"No party may assign as error the ... giving of an erroneous, misleading, incomplete, or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection."
Rule 21.3, Ala. R.Crim. P. Therefore, to the extent the appellants challenge the instruction the trial court gave, their argument is not properly before this court.
To the extent the appellants challenge the trial court's refusal to give their requested instruction on the culpable mental state necessary to commit the offense *1229 of discharging a firearm into an occupied vehicle, their argument is without merit. Their requested instruction stated, in pertinent part:
"This offense does not require the State to prove a specific mens rea or culpable mental state. However, in order to convict a defendant under this statute, the state must prove, beyond a reasonable doubt, that in the act of shooting into an occupied vehicle, a defendant either knew or should have known that his conduct was unlawful. There can be no conviction under this section of the law if the shooting is accidental or done for some legally justified purpose."
(S.C.R.42.) The trial court instructed the jury that the State must prove beyond a reasonable doubt that the appellants acted "without lawful justification." (R. 492, 502.) We concluded in Part I of this opinion that any of the states of mental culpability set forth in § 13A-2-2, Ala.Code 1975  intentionally, knowingly, recklessly, or with criminal negligence  can supply the culpable mental state necessary to commit the offense of discharging a firearm into an occupied vehicle. Therefore, we find that the first two sentences of the requested instruction did not accurately state the law in this regard. Further, we find that the instruction the trial court gave  "without lawful justification"  substantially and fairly covered the concepts of accidental or justified actions set forth in the third sentence of the requested instruction.
"A trial court has broad discretion in formulating its jury instructions, providing they are an accurate reflection of the law and facts of the case. Coon v. State, 494 So.2d 184 (Ala.Cr.App.1986). When requested charges are either fairly and substantially covered by the trial judge's oral charge or are confusing, misleading, ungrammatical, not predicated on a consideration of the evidence, argumentative, abstract, or a misstatement of the law, the trial judge may properly refuse to give such charges. Ex parte Wilhite, 485 So.2d 787 (Ala.1986)."
Ward v. State, 610 So.2d 1190, 1194 (Ala.Crim.App.1992). Accordingly, we conclude that the trial court properly refused to give the instruction the appellants requested.

III.
The appellants further argue that the trial court erred in refusing to instruct the jury on the lesser included offense of reckless endangerment. During the charge conference, they asserted generally that reckless endangerment may be a lesser included offense of discharging a firearm into an occupied vehicle. They also stated general objections, both after the charge conference and after the trial court's oral charge, to the fact that the trial court had refused to instruct the jury on reckless endangerment. However, they did not state any facts or make any argument as to why such an instruction would be appropriate under the facts of this case.
"No party may assign as error the court's ... failing to give a written instruction ... unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection."
Rule 21.3, Ala. R.Crim. P. (emphasis added). Because the appellants did not state specific grounds in support of their objections, they did not properly preserve this argument for our review. See Greenhill v. State, 746 So.2d 1064 (Ala.Crim.App.1999); Bullock v. State, 697 So.2d 66 (Ala.Crim. *1230 App.1997).[5]

IV.
Finally, the appellants argue that the trial court should have granted a mistrial after it allegedly improperly commented on the evidence before the jury. During the State's cross-examination of Terry, the following occurred:
"[PROSECUTOR]: So how were you going to start shooting? When you told the 911 caller you're fixing to have to start shooting 
"[TERRY'S COUNSEL]: Objection. That may be stating facts not in evidence.
"THE COURT: Overruled. Cross-examination.
"[PROSECUTOR]: What were you going to shoot with?
"[ANDREW'S COUNSEL]: I would like to object, Your Honor. I don't believe that's what the tape says. The tape speaks for itself. If I'm remembering that incorrectly, I apologize, but I would object on the basis that's a fact not in evidence because that's not what the tape said.
"[TERRY'S COUNSEL]: Your Honor, if I could offer 
"THE COURT: This jury knows what the tape said. This jury will have the tape to listen to should they need to, and they can correct any misstatements by either side at the time of their deliberative process. My recollection is that something similar, if not identical, to that was said on that tape."
(R. 334-35.) Thereafter, outside of the presence of the jury, Terry's counsel moved for a mistrial, arguing that the trial court had improperly commented on the evidence and had, in effect, put its "stamp of approval" on the prosecutor's argument.[6] (R. 337.) The trial court then played back the relevant portion of the 911 telephone call, heard arguments from all of the parties, and denied the motion for a mistrial, stating:
"What I said basically was that what I recalled being said on the tape was what was said on the tape and that was we're getting ready to shoot, we're going to have to shoot, we were fixing to shoot. And that is exactly what is on the tape having replayed the tape. Now, if I'm God to these jurors, then what they heard me say was correct that there's no harm. But let's forget about being God. Let's deal with this legally.
"I have told the jury that it is up to them. They will hear the tape when that tape goes to the jury room if this case goes to the jury. And they will be the ones to make the determination as to what's on that tape and whether it's *1231 as stated in the question and as characterized by the court.
"Now, I don't see any harm, therefore I am overruling the motion for a mistrial. I don't see any harm in the court saying what the court recalled a specific piece of testimony as being and then having the capacity, God blessed, to go back and really hear to see that what the court said was basically correct. So I see no harm. And I'm going to deny the motion for mistrial and ask that we go forward."
(R. 339-40.) Immediately afterward, the trial court instructed the jury as follows:
"Again, I want you not to take the fact that these little sidebars and conferences outside of your hearing have to occur. They have to occur. It would be wrong professionally and otherwise for these attorneys not to do what they have to do and what they think they have to do for their client as well as the state. It would be wrong. And that's my job is to referee these kinds of things to ensure that both sides get a fair hearing.
"I will say this to you. This issue that we just discussed had to do with whether or not the court could characterize testimony to you or not. If you will recall, the question was raised as to whether or not this witness made a statement on the 911 tape. And I said to you that you will have an opportunity to hear that tape and you will make the determination as to what the truth is. That's the third time I think I have said that to you. I don't have to make that determination, none of these people have to make that determination, only you can make that determination. So I want you to disregard what I said, okay? Please disregard it. You will listen to the tape, you will hear the tape, and you will recall whatever the answer to the question will be when we get started again. And it is up to you to make that determination in the deliberative process...."
(R. 340-41.) Finally, during its oral charge, the trial court instructed the jury as follows:
"Now, likewise, I explained to you very early on that I might sit up here and drop a pencil on the floor or turn my back or say something to Charlie over here or I might smile or may frown or I might express a fairly human emotion just as you might express it during the course of the trial. I want you to understand that nothing, nothing that I said or did or did not say or did not do, no rulings that I made either for or against the state or either defendant in any way was designed to give either of you any message about what I believe to be the guilt or innocence of either of these defendants.
"During the course of the trial, like the lawyers, I too look at the responses from the jurors. And during the course of a trial I may catch an eye of a particular juror just at a time when a witness has said something that might be significant to that particular juror. Well, I don't know what's significant in your head and you certainly can't know what's significant in mine, so the mere fact that I caught your eye at that moment in time, don't take that to mean that I either believe what they were saying or didn't believe what they were saying. Just completely disregard my input into this trial until this present moment, because I promise you I did nothing to give you any indication about anything that I believe to be the truth or not to be the truth."
(R. 478-79.)
Initially, we note that we have listened to the audiotape of the 911 telephone call, and we agree that what the trial court *1232 stated it recalled hearing was on the audiotape. Further, the trial court repeatedly stated that the jury would have the audiotape and could correct any misstatements about its content. Finally, the trial court instructed the jury, both immediately and during the charge conference, to disregard what it had said and to make its own determination about the content of the audiotape. Therefore, we conclude that error, if any, in the trial court's comment was harmless. See Rule 45, Ala. R.App. P.
For the above-stated reasons, we affirm the trial court's judgment.
AFFIRMED.
McMILLAN, P.J., concurs; WISE, J., concurs in the result; SHAW, J., concurs in part and dissents in part, with opinion, which COBB, J., joins.
SHAW, Judge, concurring in part and dissenting in part.
I agree with the majority that discharging a firearm into an occupied vehicle, a violation of § 13A-11-61(a), Ala.Code 1975, is not a strict-liability offense. See Ex parte Edwards, 816 So.2d 98 (Ala.2001). I also agree with the majority that this offense can be committed intentionally, knowingly, recklessly, or with criminal negligence, and that one of these culpable mental states is an essential element of the offense.[7] However, I cannot agree with the conclusion in the main opinion that the indictments in this case, neither of which alleged a culpable mental state, were sufficient to charge the offense.
I believe this case is materially indistinguishable from the Alabama Supreme Court's recent decision in Ex parte Lewis, 811 So.2d 485 (Ala.2001), in which Justice Lyons, writing for that Court, held that the failure to allege in an indictment an essential element of the charged offense is a jurisdictional defect that renders the indictment void. The Supreme Court quoted this Court's opinion in Barbee v. State, 417 So.2d 611 (Ala.Crim.App.1982):
"`Failure to charge an offense is the kind of defect involved in due process of law and it cannot be waived. Nelson v. State, 50 Ala.App. 285, 278 So.2d 734 (1973). Although the law does not compel a "ritual of words" in an indictment, "[t]he omission of an element of the crime, however, is not a mere formality that may be waived." United States v. Purvis, 580 F.2d 853, 857, 858, rehearing denied, 585 F.2d 520 (5th Cir.1978), cert. denied, 440 U.S. 914, 99 S.Ct. 1229, 59 L.Ed.2d 463 (1979). "An indictment that fails to allege each material element of an offense fails to charge that offense." United States v. London, 550 F.2d 206, 211 (5th Cir.1977). "Failure to charge specific intent is but a particular aspect of the failure to charge an offense." Purvis, 580 F.2d at 858.
"`A defect in the indictment associated with an essential element of the offense which leaves the accused unaware of the nature and cause of the charge cannot be waived. Crews v. State, 374 So.2d 436, 442-43 (Ala.Crim.App.1979); Andrews v. State, 344 So.2d 533, 534-35 (Ala.Crim.App.), cert. denied, 344 So.2d 538 (Ala.1977). Where an indictment is void and does not charge an offense, this Court is bound to take notice of such a defect even in the absence of an objection. Edwards v. State, 379 So.2d 336, 338 (Ala.Crim.App.1979), cert. denied, 379 So.2d 339 (Ala.1980).'"
*1233 811 So.2d at 488, quoting 417 So.2d at 613. The Court then went on to say:
"`The fact that the indictment refers to its statutory source cannot save it from being fatally deficient. The rule is that "the indictment must contain all the essentials to constitute the offense, explicitly charged, and that they must not be left to inference." State v. Seay, 3 Stew. 123, 131 (1830). The indictment cannot be aided by intendment, Poore v. State, 17 Ala.App. 143, 82 So. 627 (1919), and "nothing is to be left to implication or intendment, or to conclusion." Mastoras v. State, 28 Ala.App. 123, 126, 180 So. 113, cert. denied, 235 Ala. 519, 180 So. 115 (1938). A court is "without authority to add to, or take from, any of the material averments in the indictment, which speaks for itself and is conclusive." Crump v. State, 30 Ala.App. 241, 242, 4 So.2d 188 (1941).'"
811 So.2d at 488, quoting Barbee, 417 So.2d at 613-14 (emphasis added in Lewis).
In this Court's unpublished memorandum upholding Lewis's indictment despite the fact that the indictment failed to allege an essential element of the offense, this Court relied on Ex parte Tomlin, 443 So.2d 59 (Ala.1983), and Ex parte Harper, 594 So.2d 1181 (Ala.1991). In reversing this Court's judgment, the Supreme Court in Lewis specifically distinguished Tomlin on its facts, but it did not specifically address its plurality opinion in Harper, upon which the main opinion relies.
In Harper, the Supreme Court was faced with the same question that was presented in Lewis and that is presented in this case; as framed by four Justices in Harper, the issue was "whether scienter must be alleged in an indictment charging a person with a statutory crime." 594 So.2d at 1183. Those four Justices stated that it did not. Specifically, a plurality of the Court stated that although "knowingly" was an essential element of the offense of the unlawful distribution of a controlled substance and that an indictment "should allege that it was so committed," 594 So.2d at 1194, the failure to do so was not a jurisdictional defect that voided the indictment. According to the plurality opinion, Harper's "constitutional right `to demand the nature and cause of the accusation' (Art. I, § 6, Const. of Ala.1901) [was] fulfilled" despite the failure to allege in the indictment an essential element of the offense. 594 So.2d at 1194.
This Court followed the Harper opinion in Hunt v. State, 642 So.2d 999 (Ala.Crim.App.1993), but only because, this Court said, it "is bound by the decisions of the Alabama Supreme Court." 642 So.2d at 1026. In Hunt, this Court expressed reservations about following Harper and its break from established precedent, specifically noting that "Harper raises many more questions than it answers." Id. In this respect, I disagree with this Court's suggestion in Hunt and the suggestion in the main opinion in this case that this Court was, and is now, bound by the Supreme Court's decision in Harper, given that only four Justices agreed with the reasoning in Harper, three others concurred only in the result, and two Justices apparently did not vote on the case. There is no indication in the opinion in Harper that the two Justices who did not vote had recused themselves from the case. See Rule 16(b), Ala.R.App.P. (providing that "[t]he concurrence of five justices in the determination of any cause shall be necessary" unless "by reason of disqualification the number of justices competent to sit therein is reduced, in which event the concurrence of a majority of the justices sitting shall suffice"), and Ex parte State ex rel. James v. ACLU of Alabama, 711 So.2d 952, 964 (Ala. *1234 1998)("no appellate pronouncement becomes binding on inferior courts unless it has the concurrence of a majority of the Judges or Justices qualified to decide the cause"). Because only four of the nine Justices who were qualified to decide the case agreed with the reasoning in the opinion, I do not believe that this Court is bound by the opinion in Harper  that the failure to allege in an indictment an essential element of the offense is not a jurisdictional defect.
However, even if this Court were bound by the opinion in Harper, I believe that that opinion was overruled, at least implicitly, in Lewis. The Court in Lewis specifically declined to overrule "a long line of precedent holding that the failure of an indictment to allege an essential element of the charge is a jurisdictional defect," 811 So.2d at 489, rejecting the State's argument that that precedent made no sense in modern criminal procedure. In doing so, I believe, the Court overruled the previous opinion in Harper, an opinion that cited, but did not follow, that long line of precedent.
Harper, Lewis, and the present case are, in my view, indistinguishable. All involve the question whether an indictment must allege all of the essential elements of the charged offense. The main opinion distinguishes Lewis on the ground that, under the particular facts in Lewis, the failure to allege in the indictment the element of second-degree assault that Lewis intended to cause physical injury permitted Lewis to be convicted of a greater offense, second-degree assault, while only being charged with the lesser offense of third-degree assault under § 13A-6-22(a)(4), Ala.Code 1975. Given the caselaw relied on by the Court in Lewis, as well as the Court's broad statements throughout the Lewis opinion, I do not believe that the main opinion makes a valid distinction.
Nor do I believe that a valid distinction can be made on the ground that the essential element omitted from the indictment in Lewis was an element set out in the statute, while the essential elements omitted from the indictments in this case and from the indictment in Harper  specifically, a culpable mental state  are not included in the statutes defining the offenses charged in the indictments. If anything, the fact that the elements omitted from the indictments in this case and in Harper are not in the statute defining the offenses indicates that the indictments did not put the defendants on notice of the nature and cause of the charges against them. If reference to the statutory source cannot save an indictment that does not allege all of the essential elements of the charged offense from being fatally defective when the omitted element is contained in the statute itself, so that the accused is, if not by the indictment, at least by the statute, put on notice of all of the elements of the offense, an indictment that omits an element not even contained in the statute certainly cannot be held to sufficiently apprise an accused of the nature and cause of the charge against him or her, as the main opinion holds.
In Alabama, an indictment that tracks the language of the statute is sufficient, but only if the statute prescribes with definitiveness the elements of the offense. See, generally, Woodall v. State, 730 So.2d 627 (Ala.Crim.App.1997). The statute in this case does not prescribe with definitiveness the elements of the offense of discharging a firearm into an occupied vehicle; it omits an essential element of the offense. Thus, the fact that the indictments in this case tracked the statutory language of § 13A-11-61, Ala.Code 1975, does not make them sufficient. See Ex parte Hampton, 815 So.2d 569, 571 *1235 (Ala.2000)(holding that an indictment was fatally defective despite tracking the statutory language because the statute did not "adequately list all the elements of the offense for which [the defendant] was charged and convicted").
I also note that the main opinion states that "`the trial court could have cured the indictment in its instructions to the jury.'" 878 So.2d at 1228, quoting the appellant's brief. However, a review of the record in Lewis reveals that, in that case, the trial court properly instructed the jury on all of the elements of the offense, including the element that had been omitted from the indictment  that Lewis had the intent to cause physical injury. The Supreme Court nevertheless reversed Lewis's conviction, thus suggesting that a proper jury instruction cannot cure a defective indictment. However, even if a proper jury instruction constructively amending the indictment, see Ash v. State, 843 So.2d 213 (Ala.2002); Hampton v. State, 815 So.2d 571 (Ala.Crim.App.2001); Gamble v. State, 758 So.2d 1125 (Ala.Crim.App.1999); and Floyd v. State, 659 So.2d 961 (Ala.Crim.App.1994), cures a defective indictment, in this case, unlike in Lewis, the jury was not instructed on any culpable mental state. I do not agree with the conclusion in the main opinion that the trial court's instruction that the defendants had to have acted "without lawful justification" was sufficient to encompass any culpable mental state set forth in § 13A-2-2, Ala.Code 1975. Therefore, the indictment in this case was not constructively amended by the trial court's jury instructions.
Based on the Supreme Court's opinion Lewis, which held that the failure to allege in the indictment an essential element of a statutory offense is per se prejudicial under Rule 13.5(c)(2), Ala.R.Crim.P., because the indictment fails to charge an offense upon which a prosecution can be based, see 811 So.2d at 488 n. 2, I believe that the indictments in this case are fatally defective for failing to allege an essential element of the offense of discharging a firearm into an occupied vehicle  a culpable mental state.
Therefore, I respectfully dissent from that portion of the main opinion holding that the indictments in this case were sufficient.
COBB, J., concurs.
NOTES
[1] The appellants were also each indicted for two counts of attempted murder. However, the jury acquitted them of those charges.
[2] Elizabeth testified that Andrew "put the gun in [Jimmy's] chest." (R. 120.)
[3] Unlike the indictment in Ex parte Lewis, 811 So.2d 485 (Ala.2001), which the appellants cite, the indictments in this case did not, by omitting the culpable mental state, permit the appellants to be convicted of a greater offense while charging them only with a lesser offense.
[4] For the reasons set forth in Part II of this opinion, we conclude that that instruction was sufficient to cover any of the mental states set forth in § 13A-2-2, Ala.Code 1975.
[5] When it decided not to instruct the jury on reckless endangerment, the trial court stated:

"It's the court's ruling that I'm not going to give reckless endangerment. I do agree with the defendant that reckless endangerment may be a, under certain circumstances, a lesser included offense. I find that in this case based on the evidence in this case, which is uncontroverted, that the defendants, both of them, intended to fire at that vehicle and did do so....
"... I don't see any testimony at all that would make it reckless in nature. Their testimony is that they intended to do so. One fired five shots, intended to unload it, kept firing after the gun was empty. The other one fired three shots and said he stopped when he saw his father. So I think it's intentional. And based on that, I'm going to deny reckless endangerment."
(R. 440-41.) The facts of this case and the law on reckless endangerment support this conclusion.
[6] Andrew's counsel joined in Terry's counsel's objection.
[7] I note that the constitutionality of § 13A-11-61, Ala.Code 1975, is not before this Court.